02-10-188-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00188-CV

 

 


 
 
 In the Interest of J.G.K.,
 a ChilD
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

----------

 

FROM County
Court at Law No. 1 OF Wichita COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I.  Introduction

          Appellant
Mother appeals the trial court’s judgment terminating her parental rights to her
daughter, J.G.K.  In four issues, Mother argues that the trial court denied her
due process and abused its discretion by denying her pretrial motion to dismiss
for due process violations, that the evidence was legally and factually
insufficient to support the jury’s endangerment findings, and that the evidence
was legally and factually insufficient to support the jury’s best interest
finding.  We will affirm.

II.  Factual
and Procedural Background

          A.      Mother’s
Testimony

                   1.       General
Background

          Mother
testified that she was thirty years old at the time of trial and had given
birth to six children: J.K.P., J.G.K., T.M.J., D.J.F., T.Q.F., and G.J.M.-B.  Mother
admitted that she had never been married to any of the fathers of her six
children.  Of the six children, only G.J.M.-B. lived with Mother at the time of
trial. The following recounts Mother’s life before children, the birth of her
children,[2] CPS’s involvement,[3]
the living conditions the children experienced, Mother’s dependence on CPS and the
Court-Appointed Special Advocate Association (CASA), and the instability in
Mother’s emotional state and living arrangements that persisted throughout the
case. 

                   2.       Mother’s
Employment History and Criminal History

In
1999, Mother worked at Whataburger for two days.  That was the only job that
she had ever held.  Mother admitted that she had been charged with aggravated
robbery and that the case had remained pending for approximately two years, but
the case was dismissed after DNA testing.  Mother said that the dismissal of
the case “helped like law wise” but not as far as getting a job or an apartment
because the arrest remained on her record.[4]  Mother said that she did
not have the money to get the arrest expunged from her criminal record.[5]

                    3.       Births
of the Children and CPS’s Involvement

                    a.       Mother
Gives Birth to J.K.P. 

Mother
gave birth to J.K.P. in June 1999 and supported herself and J.K.P. by using food
stamps and Medicaid.  Mother stayed with J.K.P.’s father on Spring Lake Drive.  They
lived there for two years and then moved to the Housing Authority at 415-D
Bailey Street, paying $50 a month for rent.  After that, Mother moved in with
her mother on Gerald Street.

                    b.       Mother
Passes Out After Smoking Marijuana

CPS
first got involved in Mother’s life in May 2002 when she ended up in the
hospital after fainting from smoking “weed.”  At the time, J.K.P., who was
approximately three years old, was Mother’s only child.  Mother said that CPS
talked to her and then dropped the case.

                    c.       Mother
Gives Birth to J.G.K. and T.M.J.

In
December 2002, when J.G.K. was born, Mother was staying with her mother, who
was helping to support Mother, J.K.P., and J.G.K.  The same was true in 2004
when T.M.J. was born.

                    d.       Mother
Gives Birth to D.J.F.

When
D.J.F. was born in 2005, Mother lived in “the projects” owned by the Housing
Authority until she was evicted.[6] 
Then, Mother moved in with her mother, later moved to Park Regency, and then
moved back with her mother. During 2005, Mother was supported by D.J.F.’s father,[7]
J.K.P.’s father, food stamps, Medicaid, and her mother, who was helping her “a
lot, too.”

e.       Mother
Leaves Children with a Mentally Ill Person, and Children Are Removed by CPS

 

In
2005, Mother left J.K.P., J.G.K., T.M.J., and D.J.F with a lady named Dorothy,
whom Mother had known for only a day; Mother later learned that Dorothy had a
mental illness.  D.J.F. stopped breathing while she was in Dorothy’s care, and
Dorothy called 911.  D.J.F. was taken to the hospital, and CPS thereafter
removed the four children and placed them in foster care.  Mother received a
family plan that included counseling, drug testing, and parenting classes.

                    f.       Mother
Calls CPS to Take J.K.P.

J.K.P.
was placed with Mother’s mother in 2005 and lived with her from then until 2006.
 During that time, Mother “was staying just anywhere” because she was homeless.
 In 2006, Mother’s mother dropped off J.K.P. at Faith City Mission where Mother
was staying; Mother’s mother said that she was not going to come back to get
him.  Mother then called CPS, and CPS placed J.K.P. into foster care.[8]

                    g.       Mother
Gives Birth to T.Q.F.

When
Mother gave birth to T.Q.F. in January 2007, the other children were in foster
care.  CPS allowed Mother to keep T.Q.F. with her while she was working her
service plan.  At that time, Mother lived at 1202 Austin.  Mother said that she
paid for her own place for about four months but that it was a struggle because
she did not have a job.  She received child support and used it to pay the
rent.

                    h.       Mother
Uses Cocaine 

In
March 2007, Mother tested positive for cocaine while three-month-old T.Q.F. was
living with her.  CPS thereafter removed T.Q.F. and placed him in foster care.  Mother
moved back to the mission because the child support payments ended once all of
her children were in foster care.  CPS offered services to Mother at that time.
 Mother’s service plan included counseling, a psychological evaluation,
visitation, and parenting classes, and CPS paid for Mother’s services.

                    i.        Monitored
Return 

From
June to August 2007, J.G.K. was supposed to be living with Mother because the
case involving J.G.K. had been dismissed.  According to Mother, however, J.G.K.
was not returned to Mother because her caseworker, Tammy Durham, said that it
would be unfair to D.J.F. (who was living in the same foster home as J.G.K.)
for J.G.K. to be removed.[9]

In
August 2007, while Mother was living with her mother at 924 Gerald Street, the children
were returned to her under a monitored return plan in which they remained in
CPS custody.  J.G.K. and D.J.F. were returned first, then J.K.P., and T.Q.F.
was returned last.

During
the monitored return, Mother did not have a place of her own; she lived on
Gerald Street with her mother.  Mother described her life during that time as
“[h]ectic, chaotic.  I didn’t really have no money.  I wasn’t stable.  I was
homeless, basically.”  Mother said that Durham knew that Mother was homeless before
Durham returned the children to Mother.  Mother spent time drifting from one friend’s
residence to another friend’s residence.  Mother said that sometimes she left
because she did not like the way things were done at that friend’s house and
that sometimes she and her children were kicked out by the friend’s boyfriend.  During
this time, Mother said that she used “general delivery” for her mail and went
to the post office to pick it up.

Mother
admitted that during the monitored return, her Medicaid lapsed, her food stamps
lapsed, she did not have a home, she had no transportation, and her only
support was Social Security benefits[10] and occasional gifts of money
from family and friends.  Mother recalled that she had asked CPS for food three
or four times during the monitored return.

Mother
said that CPS should not have returned her children to her because she was
unstable and was homeless.  Mother said that she would rate that time when she
had her children as a zero for being the worst time period in her life.

(1)     School
Disruptions for J.K.P. During the Monitored Return

 

While
Mother had five of her children living with her, Durham went by Mother’s home
often to check on her.  The mornings were chaotic even though J.K.P. was the
only child going to school.  It was Mother’s responsibility to wake up J.K.P. and
get him on the school bus, but she admitted, “I didn’t do very well.”  Mother said
that Durham ended up taking J.K.P. to school “[a] lot.”

Mother
recalled that J.K.P. missed about twenty days of school while he was in her
care for six months, and she knew that he was having problems in school before
he missed all that time.  Mother had no reason to doubt the school records if
they showed that J.K.P. had missed thirty-six days of school in spring 2008.  Mother
testified that J.K.P. went to “about five different schools” from August 2007
to March 2008; Mother was surprised to hear that J.K.P. had actually attended
nine schools.  Mother also admitted that she did not do very well with the
other four children during the monitored return.

                             (2)     Various
Moves During the Monitored Return

As a
condition of the monitored return, Mother agreed to stay with her mother at 924
Gerald Street.  Mother stayed at 924 Gerald Street for about three or four
months and then moved to First Step, which is a battered women’s/family
violence-type shelter, before Christmas because she and her brother got into an
argument.  Mother could not recall whether she told Durham about moving to
First Step before or after she moved.

Mother
stayed at First Step for a couple of weeks until she was asked to leave because
she was not following the rules.  Mother moved from First Step to 506 Dallas Street
to live with a friend named Shandreka.  Mother could not recall whether she
told Durham about moving to 506 Dallas Street before or after she moved.  When
Mother moved to 506 Dallas Street, Durham went with Mother back to 924 Gerald
Street to help Mother get her children’s belongings, and Mother’s mother hit
Mother.  Mother’s brother also threatened Mother.  Durham helped Mother get out
as fast as she could, and Mother called the police.

Mother
stayed at 506 Dallas Street until after New Year’s 2008, and then for two
months, she started moving back and forth between 506 Dallas Street and a new
address on Gerald Street that she shared with G.J.M.-B.’s father.  Mother
admitted that she did not call Durham to let her know that she was moving back
and forth every time she moved; instead, Durham had to look for Mother.  While
Mother was going back and forth between the new address on Gerald Street and
506 Dallas Street, there was a time when Mother refused to tell Durham where
she and her four children were living, but Mother took them to the CPS office.  During
that time, Mother was staying with her cousin Latoya, G.J.M.-B.’s uncle, and Latoya’s
two children.  Mother did not stay with her cousin for long because Durham
threatened to remove the children if Mother did not tell her where she was
living.[11]

                              (3)     T.Q.F.
Gets Sick in Mother’s Care

In February
2008, Mother took T.Q.F. to the hospital where he was diagnosed with RSV, pneumonia,
and an ear infection.  Mother did not have Medicaid or food stamps because she
had let them lapse around October 2007.

                             (4)     Mother
Continues Relocating

After
Mother took T.Q.F. to the hospital in February 2008, Mother moved in with a
friend named Ta’Niel who lived on Britain Street.  Mother admitted that she did
not call Durham prior to moving to Britain Street.

After
a week at Britain Street, Ta’Niel moved to 205 Cleveland Street in March 2008,
and Mother moved with her.  Mother said that it was Ta’Niel’s idea to move to
Cleveland Street;[12] Ta’Niel rented a house,
and Mother moved in with her.[13]  Mother did not inform
Durham prior to the move.[14]

                             (5)     Dangerous
Conditions at 205 Cleveland Street

The
Cleveland Street apartment had two bedrooms; Mother and her five children were
in one bedroom, and Ta’Niel and her boyfriend lived in the other bedroom.  Pictures
of the kitchen revealed a cabinet door that was broken off underneath the
counter and a broken counter edge that was dangling.  After Mother moved in,
Durham came by and told her that the house needed to be cleaned up quickly.  Durham
pointed out to Mother that there were rat feces in the house, as well as boards
with exposed nails on them, which posed a danger to children.  Mother said that
the pictures that were admitted into evidence showed the worst areas of the house,
indicating that they did not accurately reflect the whole house.  Even so, Mother
agreed that the house was dangerous, but she testified that she had nowhere
else to go.

                    j.        CPS
Removes Children Again

On
March 5, 2008, CPS removed all five of Mother’s children; G.J.M.-B. had not
been born at that time.  Mother said that CPS stepped in because she could not
take care of her children.  Mother recalled that J.G.K. had two ringworms when
she was removed.[15]  Additionally, T.Q.F.
was not current on his vaccinations.  Mother admitted that she had not sought medical
treatment for J.G.K. or vaccines for T.Q.F. because her Medicaid had lapsed.  Mother
denied that the children were dirty when they were removed.  

Between
the time that Durham initially saw the house on March 4, 2008 and the time
Mother’s children were removed on March 5, 2008, Mother had cleaned the house a
little but had not cleaned up everything that CPS had requested in the limited
time she was given.  Mother admitted that the house was unsafe in its condition
but said that it could have been made safe if she had been given ample time to
clean it.

Mother
initially did not recall whether the police came during the removal.  After a
lunch break during the trial, however, Mother recalled testifying in September
2009 that Durham, Valerie Soto with CASA, investigator Samantha Li, and the
police were present for the March 2008 removal.  Mother said that she did not
threaten Durham, but Mother recalled telling Durham that if she came and took
Mother’s children, there was going to be trouble.  Mother admitted that her
threat could explain why the police came with Durham.  On the date of the
removal, Mother did not recall anyone threatening to shoot the CPS workers if
they came inside the house to remove the children.  Mother said that it was a
lie if someone testified that a threat had been made to shoot anyone who came
in and took the children; no one was arrested for making a threat.

After
CPS took custody again of all of Mother’s children, except G.J.M.-B. who had
not been born, a new case was filed on J.G.K.

                    k.       T.Q.F.’s
Failure-to-Thrive Diagnosis

The day
after the removal, T.Q.F.’s foster family took him to Dr. Hollis, a
pediatrician, who diagnosed T.Q.F. with failure to thrive.  Mother testified
that she had noticed that T.Q.F. was not growing from age eight months to
thirteen months, but she never took him to the hospital.  When Mother
eventually took T.Q.F. to the hospital for RSV and bronchitis, the hospital
told her that T.Q.F. had lost weight because he had been sick; Mother said that
she did not know why the hospital did not put that in the medical records.  Mother
said that her story about T.Q.F.’s losing weight from being sick and her story
that she had noticed that he was not getting bigger are both true.  However, Mother
admitted that her inaction in seeking treatment for T.Q.F.’s failure to grow had
endangered him and that it was “real irresponsible.”

                    l.
       Mother Moves to Faith City Mission

After
Mother’s five children were removed, the trial court ordered that Mother
receive a service plan, but she did not receive one until October 2008.  At
that time in October 2008, Mother was living at Faith City Mission and was
pregnant with G.J.M.-B.  Johnson went over the service plan with Mother, and
Mother said that she understood everything on the plan.

                    m.      Mother
Gives Birth to G.J.M.-B.

In
November 2008, Mother gave birth to G.J.M.-B. while Mother was living at Faith
City Mission and all of her children were in CPS care.  Mother said that she stayed
at Faith City Mission for almost a year and was very grateful for their help.

After
G.J.M.-B. was born, Patrick Barber and someone else with CPS came to the
hospital, and Mother said that they thought she was going to hand over
G.J.M.-B.  But Mother begged to keep her baby and was allowed to go back to the
mission and to take G.J.M.-B. with her.

Mother
stayed in a family room with G.J.M.-B.  Faith City Mission provided
Mother with everything for her and G.J.M.-B.  Mother had chores to do at the
mission.  The mission told her about the Christian Women’s Job Corps (CWJC),
and Mother took classes through that organization.  The CWJC provided childcare
for G.J.M.-B. while Mother took classes.  Mother, as required, stayed current
on her Medicaid while she was at the mission.

While
Mother and G.J.M.-B. were at the mission, Barber stopped by to check on
Mother’s accommodations and to watch her interact with the baby.  Thereafter,
the trial court held a hearing involving a nonemergency removal of G.J.M.-B.,
and it gave custody to the Department but allowed G.J.M.-B. to stay with
Mother.  The orders stated that G.J.M.-B. would stay with Mother for 180 days.

The
trial court approved Mother’s stay at the mission because the mission was
providing Mother with everything she needed.  Mother recalled that Judge
Bondurant, the associate judge who oversaw Mother’s case, had instructed her
not to move out of the mission into another home with G.J.M.-B., until Joe
Steimel the ad litem, Mauri Reed, and Judge Bondurant approved the move.

Prior
to May 2009, the trial court ordered Mother to apply for Social Security, and
she was awarded Social Security benefits in May 2009 and received a lump sum
check for over $2,000.[16]  Judge Bondurant ordered
Mother to go to the Housing Authority and try to get unbarred.[17]  CASA and Linda Johnson went
with Mother and helped her get unbarred, and then they discovered that Mother
owed approximately $100 before she could get in.  The people at the mission
told Mother to save the $2,000 lump sum payment that she had received from
Social Security and to use it to get into the Housing Authority, which would
have charged her only one hundred to two hundred dollars for rent.  Instead, Mother
used the $2,000 to rent a place to live, to buy furniture, and to purchase
G.J.M.-B. “some summer clothes and stuff.”[18]

n.       Mother’s
Living Arrangements After the Mission and G.J.M.-B.’s Temporary Removal

Mother
admitted that she had failed to notify anyone prior to moving from the mission
to an apartment at 1919 8th Street.  According to Mother, there was a hearing the
week that she moved from the mission, and everyone was aware that Mother was
moving.  However, after Mother moved and CPS saw that Mother was no longer at
the mission, Judge Bondurant ordered G.J.M.-B. removed from Mother’s care while
the house was being checked out by CPS.  After the house was inspected, Judge
Bondurant allowed G.J.M.-B. to stay with Mother and dismissed the case.  That
was the only time—approximately a week and a half—that G.J.M.-B. was not with
Mother.

4.       CPS’s
Visits to Mother’s Apartment

Mother
said that all of the children with pending cases were in foster care, so she did
not understand why the Department had to come check on her.  Mother said that
she thought she was supposed to call and check in; she did not know that she
was supposed to tell them where she was.  So Mother believed that it was an
invasion of her privacy when CASA came to check on her, knocked on her windows,
and looked through her windows.  Mother said that she answered the door when
she was home and that neighbors had told her about CPS’s knocking on her
windows and looking into her house.  Mother later admitted that there was one
time when she was at the 8th Street apartment when she was home but did not
answer the door.  Although that occurred when the Department had custody of
G.J.M.-B., Mother said that CPS did not have the right to look in her windows.  Mother
believed that they were just looking for something to use against her in court.

5.       Mother’s Service Plan

Mother’s
service plan required her to obtain stable housing and stable income.  She was
required to attend parenting classes and counseling and to obtain a legal
source of income.  Mother took parenting classes and did her counseling through
CWJC, and she obtained Social Security income.  As discussed in more detail
below, Mother was required to prepare a written budget, and she prepared
budgets showing how she would handle her finances if each of the six children
were returned to her.

Mother
was also required to exercise patience with her children during her visits; she
admitted that there had been times in the past when she had been impatient with
her children.  Mother felt that she had progressed in that area “[a] whole
lot.”

Mother’s
service plan also required her to remain drug free, and she testified that she
had done so, that she had never tested positive on a drug test, and that drugs
were not an issue for her.[19]  Mother said that she
did not drink alcohol and that it had been years since she had used a
nonprescription drug.

Mother
obtained a clean home and allowed CPS to visit.  Mother was required to be
honest with CPS, and she had progressed in that, only failing to tell Durham
when she had moved.

6.       Mother’s Budgets

The
budgets that Mother was required to prepare were admitted into evidence.  Mother
marked $0 for every category on the budget that she prepared when she was
living at the mission from September 2008 to May 2009 because the mission
provided her with everything.

After
Mother moved out of the mission, Mother paid $500 per month for rent.  With her
other expenses, Mother spent $779 per month total.[20]
 Mother explained that T.M.J.’s father gave her the $104 per month that
exceeded her Social Security check.[21]  However, T.M.J.’s
father was in jail prior to February 2010 and went back to jail the week of
Mother’s termination trial.[22]

Mother
admitted that she was also paying $130 per month on tickets for disorderly
conduct.[23]
 Including her tickets, Mother’s monthly expenses totaled $909.  Mother said
that she was “shorting” her landlady to pay her other bills.  Mother paid only
$300 of her rent in April 2010.  Mother explained that she had paid only $200
for rent the month of the trial (May 2010) because her landlady had not fixed
what Mother wanted her to fix.

Mother
said that her cousin Darissa had given her less than a hundred dollars.  Mother
also said that her mother had given her forty or fifty dollars since January
2010.

7.       Mother’s Car

Mother
said that she did not have transportation until she bought a car in January
2010.  Mother testified at trial that she had been paying $140 per month for
her car for approximately five months.  Mother had no driver’s license and no
insurance and admitted that she would go to jail if she did not make payments
on her tickets.  Mother had paid $350 for her car; she was continuing to pay
$140 per month.

Mother
still did not have car insurance or a driver’s license at the time of trial.  She
said that she was working on those items and had been working on them for “a
while” but that it was a process because she needed to pay off four tickets and
to obtain a required form.  Mother admitted at trial that she could be stopped
at any time and given another ticket for having no driver’s license and no car
insurance.  Mother knew that driving without a license and without insurance is
a crime; she had thought about the possibility that she could go to jail for
driving without a license and car insurance, and that was why she did not drive
every day.

Mother
said that G.J.M.-B. rides with her when she drives her car.  Mother said that
if her children were returned to her that she would not drive without a license
and car insurance.  But Mother also said that if her baby needs to “go
somewhere, I’m gonna take her where she need[s] to go.”  Mother admitted that
her actions were not responsible.

Mother
realized during cross-examination at trial that she could have put the money
that T.M.J.’s father had given her toward car insurance or a driver’s license
or toward hiring an attorney to have the aggravated robbery expunged from her
criminal record.  She admitted that the way she had spent her money was not a
good example of stability and responsibility.  Mother also admitted that she had
received a $500 income tax refund and that she could have put that toward car
insurance, a driver’s license, or expunging the aggravated robbery from her criminal
record.  Instead, Mother had used the money from T.M.J.’s father and the $500
tax refund to buy a car, to buy “stuff” for G.J.M.-B., and to pay the phone
bill.  She noted that she did not spend any money on herself.

8.       Mother’s Living Arrangements at the Time of
Trial

At
the time of the trial, Mother was still living at 1919 8th Street, and she had
been living there for almost a year.  In August or September 2009, Johnson came
by Mother’s apartment and took pictures.  Mother testified that her cabinets of
food were fuller at the time of the termination trial than they were when the
pictures were taken.

Mother
turned in her landlady to code enforcement for code violations shortly before
the trial because Mother had a very difficult time getting her landlady to make
repairs.  As noted above, Mother had “shorted” her landlady for not properly
fixing items that Mother had requested.[24]  For instance, Mother
had a hole in her bedroom wall, and the landlady put paste over it; the
landlady had cut a hole in the kitchen floor and put plywood over it and nailed
it down; the faucets in the kitchen were outdoor faucets; the bathtub faucet ran
constantly and the bathtub was rusted; the living room closet door had fallen
off its hinges, as had the cabinet door in the bathroom; and the landlady had
not sprayed for roaches.  Mother said that every other month, the gas, the
lights, or the water were being cut off, even though her rent included “all
bills paid”; Mother found out that the landlady had not been paying the utility
bills.  Mother admitted that she had not paid the full amount of rent for
approximately four months and that an eviction proceeding was pending.

 Mother
said that her lease would expire at the end of June and that she was not
planning to stay at that apartment.  Mother had looked at an apartment near the
air force base for $410 per month, all bills paid; the landlady at that
apartment had said that she would work with Mother regarding the deposit. 
Mother had also looked at an apartment on Austin Street for $325 per month that
included only water; the deposit was $100 and would require Mother to pay for
electricity.  Mother said that she would let CPS know as soon as she decided
where she would be moving.

9.       People Who Lived with Mother

Mother
admitted that her children had witnessed acts of family violence in the past.  Mother
said that her brother Prentice had stayed with her sometimes but was not living
with her at the time of the termination trial.  Mother’s brother sometimes
spent the night with her at least one night a week.  Mother admitted that her
brother had threatened her, but she stated that “he would never do nothing to
me.”[25]  Mother denied telling
her landlady that her brother had given her a black eye.  However, there was
evidence that Mother’s brother had beaten up his girlfriend, and Mother agreed
that a person who beats up his girlfriend is not a good person to have around
children and that having that type of person around could endanger a child.

Mother
testified that she was not in a relationship at the time of the trial.  Mother
admitted that T.M.J.’s father had come to her house and that she had sex with
him from time to time.  T.M.J.’s father beat her, and she had requested that a
protective order be issued against him in 2005.  Mother said that T.M.J.’s
father smoked marijuana but not at her house because she does not allow it.  Mother
agreed that it was not a good thing to have children around someone who does
drugs because that could endanger the children.

10.     Mother’s Support at the Time of Trial

Mother
understood that she would not receive child support if J.G.K.’s father’s
parental rights were terminated.  Mother was not on WIC at the time of the
termination trial because she said that “[t]he same thing I get on WIC, I can
get on food stamps.”  Mother later admitted that WIC would give her more than
her $365 for food stamps because WIC would allow her a three-month supply of
groceries.  Mother admitted that she had let her food
stamps lapse in the past but said that she currently had food stamps and was on
Medicaid at the time of the termination trial.  Mother said that she would
receive $150 more in food stamps but no increase in Social Security.

                    11.     Concrete
Services Provided to Mother

When
asked if CPS gave Mother a second chance by giving her a service plan to work
after removing her fifth child, Mother said that CPS gave her “[h]eartache and
pain.”  Mother said that she did not ask CPS to do anything for her except once
when she needed approximately $100 to pay the Housing Authority, but she ended
up taking care of it herself because CPS would not give her the money.  However,
Mother admitted that CPS had paid for all of her services until she went to the
CWJC, at which time she was able to work her parenting classes while she was
there.

Mother
told CPS and CASA that she did not have food and clothing for her children, and
CPS and CASA went and purchased food and clothing for her children.  CPS
provided a lot of food when Mother let her food stamps lapse while she had her
five children from August 2007 to March 2008.  Mother also received sleeping
bags, school uniforms, and school supplies, but Mother said that she did not
ask for those items.  Mother had called and asked Durham to take J.K.P. to
school, and Durham complied and gave him rides multiple times.  CPS gave Mother
bus passes after they decided to no longer transport her because she had
threatened CPS following the removal of the children.  Mother admitted that she
was thankful for the mental help, the bus passes, and the food that CPS had
given her.

12.     Visits with Children

Mother’s
weekly visits with her children at the CPS visitation center lasted an hour.  Mother
said that she regularly visited her children unless she was sick.

Mother
said that she was “very, very, very upset” at the visit in April 2009 when she
slammed and broke the door at the visitation center because she wanted to know
why J.G.K., who was in foster care, had scratches on her cheek, but Durham told
her that she would not call to get an explanation from the foster parents.  Mother
said that she was on her medications at the time of that outburst.

Mother
testified that G.J.M.-B. was a very healthy child who only got sick with colds
but said that she had battled diarrhea in February 2010.  Mother called and
cancelled her visit on February 4, 2010, because G.J.M.-B. was ill.  Mother had
called the doctor, but she had not taken G.J.M.-B. in to the doctor’s office.  Mother’s
visit on February 11, 2010, was cancelled due to snow.  Mother called and
cancelled her February 18, 2010 visit because G.J.M.-B. had a cold.

On
February 25, 2010, Mother called CPS less than two hours before her visit to
tell them that she was in Lawton with a friend named Kanesha and would not make
her visit.  Mother admitted that on the last Thursday of February, after not
having seen J.G.K. all month, Mother had chosen to go out of town with a friend
on a day when she knew she had a visit scheduled.  Mother said that she had
chosen to go shopping in Lawton instead of visiting with her children “[t]o
just get away. . . . out from all of this drama.”

Mother
visited her children on March 4, 11, 18, and 25 and on April 1 and 8.

Mother
called on April 15 and cancelled her visit because she was sick.  On April 22,
2010, Mother was ten minutes late because she was ill with a sinus infection.  On
April 29, 2010, Mother called and cancelled because she was still sick with a
sinus infection.  Mother said that she had gone to the doctor but had not been
able to get her prescription.

On
May 6, 2010, Mother cancelled her visit due to a “head cold.”  On May 13, 2010,
the Department allowed Mother a two-hour visit to make up for previous missed
visits, but Mother left an hour early because she was sick.

                    13.     Mental
Health

Mother
admitted that CPS had been in her life for a long time and that she had become
“pretty suspicious” of CPS during the “last several years” preceding the termination
trial.  Mother was diagnosed with bipolar disorder and depression in 2006 when
she underwent a psychological evaluation through CPS.[26]
 Mother admitted that she had a mental illness and that was the reason she
received Social Security benefits.  Mother testified that she went to Helen
Farabee Regional MHMR Center for medication and treatment.[27]
 Mother had undergone several psychological exams and said that she had been on
medication for bipolar disorder and depression for approximately two years.  She
said that her medications had been changed three times during the last year and
that there were some side effects including dizziness, sleepiness, and
diarrhea.  Mother said that she took her medications as prescribed every day and
that her medications worked “extremely good” for her and helped to keep her
calm.

As
part of her service plan, Mother saw Dr. Sabine for the psychological
evaluation.  After the psychological evaluation, Mother started seeing Dr.
Salkeld, but Mother no-showed enough times that the Department would no longer
pay for Dr. Salkeld’s services.[28]  Mother had been told in
April 2010 that she could use Medicaid to continue Dr. Salkeld’s services, but
as of the time of trial, Mother had not made arrangements for that and was not
sure who she wanted to seek treatment from.  She said that she was “looking
into it.”

14.     Mother’s Anger Issues

In
addition to her mental health medications, Mother attended classes in 2002 and
2003 to deal with anger.  Mother said that the Department never talked to her
about her yelling and screaming at her children.

Mother
said that the day she met Johnson, Mother had been in a screaming match with
Durham and another CPS worker named Kristi Row because J.G.K. had a scratch on
her face and Mother wanted to know what had happened to her.  Mother slammed
and broke a door at the visitation center.

Mother
admitted that she had gotten into arguments and yelling matches with CPS over
her children.[29]  Mother yelled or hung
up on Johnson numerous times after she became Mother’s caseworker.  When the
Department refused to give Mother money to pay her outstanding balance at the
Housing Authority, Mother said that she did not yell but told Johnson, “[Y]’all
help everybody else, people that’s on drugs can get some help.  But a parent
that’s trying to do something and love their child and try to get their kids
back, y’all don’t ever want to help them or do nothing for them.”

15.     G.J.M.-B.’s Life

At
the time of the termination trial, G.J.M.-B. was current on her vaccinations,
and her Medicaid was current and had never lapsed.  Mother
said that CPS never told her that she was not doing a good job with G.J.M.-B.;
CPS always told her that G.J.M.-B. was getting so big and that she was so
pretty.  Mother said that G.J.M.-B., who was one year old at the time of the
termination trial, was very friendly, liked to talk to people, was very loving,
gave hugs and kisses, liked to learn new things, and loved her Betty Boop doll.

Mother
agreed that it was her sole responsibility to take care of her children.  Mother
said that she had not asked anyone for help with G.J.M.-B. and that anyone who
had helped her had helped because they wanted to.  Mother said that she never
called the foster families and asked for help; the foster families called her.

16.     Other Children’s Lives

Mother
testified that J.K.P., who was ten at the time of the trial, had a bad attitude
sometimes, but overall, he was lovable, understanding, and a good kid who did
his best to please people.

Mother
said that T.M.J., who was five at the time of the trial, had a very motherly
instinct, was very sweet, loved school, was a very good kid, was always happy,
but did not like to be teased.

Mother
said that D.J.F., who was four at the time of the trial, was no-nonsense and told
people her feelings, was a very sweet kid, and loved her sisters and her
brothers.  Mother admitted that it had been a long time since D.J.F. had sat
through an entire visit with Mother without leaving early.

Mother
did not know anything about T.Q.F., who was three at the time of the
termination trial, because he had been in CPS custody since he was three or
four months old.  At the time of the trial, Mother testified that her case
involving T.Q.F. was on appeal and that she hoped to get him back.[30]

Mother
agreed that D.J.F., T.M.J., and J.K.P. were “all in the same spot” because CPS
had been appointed permanent managing conservatorship, but it was Mother’s hope
that she could go back to court and get them.  She said
that hope is what led her to turn her life around.  She testified, “[M]y kids
is my world.  They are more important to me than anything.  I love my kids. 
I’m going to fight, going to keep on fighting.  I’m not going to stop
fighting.”  Mother said that she loves all of her
children equally and that no one has ever accused her of hitting her children
or of letting them be sexually abused.

17.     J.G.K.’s Life

Mother
testified that J.G.K., who was seven at the time of the trial, was a people
pleaser, was lovable, was very helpful, had a motherly instinct, had always
been happy, and was a very good kid.  Mother admitted that J.G.K. had been in
foster care most of her life.  Mother did not believe the foster family that
J.G.K. was living with was a loving, stable, safe environment based on what
J.G.K. had told her.

18.     Mother’s Plans for J.G.K.

Mother
explained, 

I would really like a
second chance with my daughter.[31]  I feel that they gave
me my kids back at a time when I wasn’t ready.  Now, I’m more stable.  I have
money that I can take care of my -- my kids now.  And I would really like for
y’all to return my daughter to me.

Mother
testified that her mother, her cousin Darissa, and her sister Toi had watched
G.J.M.-B. for her and that these same people would help her take care of J.G.K.

Mother
did not have a bed for J.G.K. at the time of the termination trial but said
that she would obtain a bed for J.G.K. if she was returned to Mother; Mother
said that the mission “give[s] away stuff every day, all day.”  However, Mother
admitted that she had not checked into getting J.G.K. a bed from the mission.

Mother
said that she could get clothes for J.G.K. from the mission and that she could
buy some as well; Mother said that she would use some of her Social Security
check to buy the clothes and would not “short” anyone, but she did not explain
how her $675 would cover her $909 of bills, plus buy additional items for J.G.K.
 Mother testified that she would be able to care for J.G.K. in addition to
G.J.M.-B. because she was moving to a cheaper house.[32]
 She said that she would “make it and continue not to ask CPS or nobody for
nothing.”

Mother
did not know where J.G.K. would go to school if she was returned to Mother; Mother
said that she would send J.G.K. wherever the school district told Mother to
send J.G.K.  Mother admitted that she had a “bad history of getting [J.K.P.] to
school.”  Mother said that she was more stable now and not moving from place to
place.  She said that she was irresponsible back then but that she is more
responsible now.  She said, “I had a lot of growing up to do” but that she had
grown up a lot.  Mother was asked how getting evicted, shorting her landlord, and
driving a car without insurance and without a license—when she could have spent
money to obtain those things—made her stable at the time of the trial; she
admitted that was irresponsible.  Mother admitted that her children had paid
for her irresponsible behavior more than she had.

When
Mother’s counsel told her that the trial court could terminate her parental
rights, she responded, “Oh, please don’t do that.  I love my kids.  I’m not
perfect.  And I’m entitled to make mistakes.  Please don’t do that.”  Mother
asked that J.G.K. be returned to her.

19.     Mother’s Admissions

Mother
admitted that some of her testimony at the current trial was not the same as
what she had given at the previous trial.  Mother testified in the previous
trial that she appreciated the help that CPS had given her and that if not for their
help, it “probably would have taken longer” to get back on her feet.  Mother
admitted that she had lied when she had testified at a previous hearing that
the mission had given her a bed, a bassinet, strollers, and clothes to keep
forever.  Mother admitted that she had lied to the trial court at a previous
hearing when she said that she had not moved out of the mission after the
Department presented evidence that she had moved out of the mission because she
was spending the night at an apartment.

Mother
admitted that she had lied in the previous trial and that “progressing in
telling the truth” meant that she was not telling the truth all the time.  However,
Mother said that the jury should believe her now because she did not have
anything to hide.  Mother said that she had lied in the previous trial because
she did not want Durham to get fired from her job.

B.      Durham’s
Testimony

Tammy
Durham took over Mother’s case from Brenda Moore, who was Mother’s first
caseworker.  Durham monitored Mother’s progress on the service plan that Moore
had given Mother.

Prior
to Durham’s returning the children to Mother in August 2007, Mother kept
telling her that she was ready to take care of her children, and she was doing
everything that Durham had asked her to do and had good support.  Because
Mother was deemed at least minimally compliant with her service plan, the
Department asked the trial court to do a monitored return.

In
October 2007, while Mother had the children under the monitored return, Durham
was not aware that Mother did not have her food stamps or her Medicaid up to
date, which would have been a violation of a monitored return.  Durham learned
that Mother’s Medicaid was not up to date when CPS received a referral regarding
T.Q.F.’s hospitalization in February 2008.[33]  Durham admitted that
she had “mess[ed] up” another time in October 2007 because Mother had a
positive drug test; however, Durham did not learn of the results until two
weeks later because the system for reporting the results had changed.  At that
point, Durham felt the time had passed for removing the children based on that
drug test.  Mother denied using drugs, an investigation followed, and Mother
signed a safety plan stating that she would not use drugs.  According to
Durham, another mistake was made when the DA’s office in Wichita County failed
to file for an extension of the one-year mandatory dismissal in J.G.K.’s case,
and it was dismissed.  From August 2007 to March 2008, the Department had no
relationship with J.G.K.

When
the children were returned to Mother under a monitored return, Durham told
Mother that she was not to move the children without telling Durham or someone
from CPS in advance.  Although Mother said that she understood that
requirement, she violated it numerous times; Mother failed to give notice of
every move, except that she did call the day she moved to the Cleveland Street
apartment.  Durham did not expect Mother to tell her that she was moving to
First Step because it was an emergency shelter, but Durham expected Mother to
tell her in advance of the other moves.  Every time Mother moved, Durham
reminded her that she was supposed to give Durham notice before she moved.  Durham
testified that it was wrong of Mother to keep moving with the children, who
were in the Department’s care, and not notify Durham.

During
the monitored return from August 2007 to March 2008, Durham talked to Mother
almost every day and visited with her face to face at least once a week, even
though Mother was drifting from place to place living with other people.  When
Durham visited Mother’s home while the children were living there, Durham heard
Mother yelling and screaming at the children.  Durham tried to talk to Mother
about her yelling, but Mother would not talk about it.  During that time,
Durham felt that Mother was in a desperate situation, and Durham asked to
remove the children based on her visits with Mother and her unstable housing.  The
Department told her that the situation was not egregious enough; Durham
disagreed.

Durham
said that for two months beginning in January 2008, Mother moved back and forth
between Gerald Street and Dallas Street five to ten times;[34] each time, Durham did not
know that Mother had moved until she went to look for her.  Durham said that it
was initially permissible for Mother to stay with her mother because she had
kept J.K.P. in the past.  Mother’s mother was willing to allow Mother and all
five of the children to stay with her for as long as it took for Mother to get
a house.  But Durham was present when Mother’s mother hit her.  At that point,
it was not a good idea for Mother to move back to 924 Gerald Street, so she
moved to Dallas Street.[35]

During
the monitored return, Mother’s household was chaotic.  Durham testified that
Mother took the children with her every time that she moved back and forth between
Dallas Street and Gerald Street and that the two houses were not in the same
school district, so J.K.P. had to change schools.  Many times when Durham
showed up at Mother’s house in the mornings, J.K.P. was still there instead of
in school, so Durham took J.K.P. to school.  Often, Mother called and asked
Durham if she could come and give J.K.P. a ride to school.  Around Christmas,
J.K.P. was out of school when he was supposed to be in school, and Mother told
Durham that “all he was missing was his party.”  However, Mother had not even enrolled
him in school at that time.  Durham said that Mother did not take
responsibility for J.K.P.’s missing school.

Before
Mother moved to Britain Street, she talked to Durham about moving to Texarkana
and taking her children with her.  Durham explained that Mother could not move
out of state.

Durham
said that Mother asked for food several times during her visits to Mother’s
residences, but most of the time, she called to ask CPS to bring food.  Mother
told Durham that she was running out of food because the people who were in and
out of her house were eating her food.  Durham told Mother to tell them not to
eat her food, and then Durham brought Mother more food.  Durham told Mother
that she needed to be sufficient on her own and not depend on the Department
for rides, food, diapers, and formula, but Mother told her that she expected
CPS to provide all those things for her.  CPS provided all those items—plus
sleeping bags, a playpen, clothing, and school uniforms—while Durham was
Mother’s caseworker.  Durham said that CASA provided a bed to Mother.  Durham
said that Mother asked for those items; CPS did not just give them to her.  Durham
said that the only thing that Mother demanded that CPS refused to provide was
transportation after Mother threatened them following the removal; however, CPS
provided Mother with a bus pass.[36]

In
February 2008, there was a new referral, and Durham got involved in the
investigation because of her knowledge of the case.  T.Q.F. had been admitted
to the hospital for pneumonia and RSV, but Mother had no way to get his
prescriptions filled because she did not have Medicaid.  The referral was made
because T.Q.F. could not be released from the hospital without his medicine.  Mother
contacted CASA, asking for help with T.Q.F.’s prescriptions.

Durham
had a phone conversation with Mother in March 2008 in which Durham explained
that the doctor had diagnosed T.Q.F. as failure to thrive, which meant that he
was malnourished.  Mother started screaming at Durham, “You’re saying I’m not
taking care of my kids,” and she told Durham in a threatening manner that she
would pay.  At one point, Mother threatened “to come up and whoop” Durham, and
that is when the Department decided that it would no longer transport Mother
but would instead provide a bus pass.  Mother later apologized to Durham for
the threats she had made.

Durham
went to the house on Cleveland Street and saw the children on March 4, 2008,[37] and she discussed
the conditions of the house with Mother.  The Department found rat feces and
feces on the walls.  There were boards with nails sticking out of them.  The
food that was sitting out was not good.  Pictures were taken of the conditions
because they were endangering for the children.  The conditions at the Cleveland
Street residence violated the conditions of the monitored return, as did
Mother’s moving without telling Durham in advance.  Durham asked Mother to
clean up her residence to a livable standard.

Durham
did not remove the children on March 4, 2008, because she wanted to give Mother
“time to get it straightened up.  They had just gotten there.”  Durham talked
to her supervisors, and they were unmoved until they saw the pictures of the
house.[38]
 At that point, the Department obtained full custody of all the children,
including J.G.K., and gave Durham approval to remove the children.[39]


Durham
took the police with her when she went to remove the children; Durham said that
was not normal CPS procedure.  Durham took the police because Mother had always
told her that if she took Mother’s children, Mother would fight her.  When
Durham arrived at Mother’s with the police, she heard Mother’s voice coming
from the house stating that she had a gun and would shoot.  Mother’s friends Ta’Niel
and Shandreka were the only other adults in the house.  The police were
eventually able to diffuse the situation, and the children were brought out wearing
the same clothes from the previous day and smelled because they had not bathed.
 After the removal, Mother left a voicemail for Durham stating that she did not
want to talk to Durham anymore and that if Durham had anything to say, she
could say it through the new caseworker.

When
Durham removed J.G.K. in March 2008, she was not able to initially place her
back with the same foster parent, but ultimately she was returned to the
initial foster mother.  Durham agreed with Mother’s statement that J.G.K. had
been in foster care most of her life.

Durham
was present in April 2008 at the visit with Kristi Row when Johnson was
introduced and took over Mother’s case.  Mother was angry and screamed because
she thought J.G.K. had been hurt in foster care.  Durham tried to talk to
Mother about it, but she would not talk to Durham.  Mother left and slammed the
solid core door and broke it off its hydraulic door closer.  Durham testified
that she would be concerned about Mother’s mental stability if Mother had been
taking her medications when she broke the door at the visitation center.  Durham
saw J.G.K. during that visit and did not notice any bleeding or scratches on
her face.

Durham
said that if evidence showed that Mother had been living on her own with a
lease of her own for eleven months and paying rent and that she was now
receiving a disability check every month, that would be an improvement from
when Durham left the case.  However, Durham testified that her opinion would
change if evidence showed that Mother was in the process of being evicted
because that would be the same as when Durham had the case (i.e., Mother was
homeless).  Durham testified that her opinion would also change if evidence
showed that Mother had spent more than she received and was having to rely on
others because that would be similar to what had occurred when Durham handled
the case.  Durham disagreed that completion of parenting classes and completion
of counseling would be an improvement because Mother had completed parenting
classes and was in counseling while Durham was her caseworker.  Durham had
spoken to Mother several times in passing since Johnson had taken over the
case, and Mother’s temperament was good.

C.      Dr.
Hollis’s Testimony

Dr.
Hollis saw T.Q.F. for the first time on March 6, 2008,[40] when T.Q.F.’s foster parents
brought him in to establish care and because he had recently been hospitalized
with RSV, bronchiolitis, and pneumonia.  T.Q.F.’s foster mother was concerned
because he could wear the same clothes as when he left her home approximately
seven months prior.[41] 
Dr. Hollis testified that a healthy and appropriately growing child at thirteen
months old should not be the same size as when he was eight months old.

Dr.
Hollis’s assistant weighed T.Q.F. on March 6, 2008.  The medical notes from the
appointment do not indicate what type of clothes T.Q.F. was wearing or whether
he had shoes on when he was weighed, but Dr. Hollis recalled that he was weighed
with his full clothing, diaper, and shoes on, and his weight was below the
fifth percentile.[42]
 Dr. Hollis put T.Q.F. on a concentrated formula and instructed her staff to
weigh T.Q.F. with only his diaper on at follow-up visits.  When Dr. Hollis saw
T.Q.F. at the second visit, which was one week after the March 6, 2008
appointment, he had dropped well below the fifth percentile; his weight dropped
from nineteen pounds, two ounces to eighteen pounds, four ounces.  At the third
visit, T.Q.F. weighed nineteen pounds, eight ounces.  At the fourth visit,
T.Q.F. weighed nineteen pounds, thirteen ounces.  For the most part, T.Q.F. thereafter
continued to steadily gain weight.  T.Q.F. was off the concentrated formula by
the time he was eighteen months old, and he was between the twenty-fifth and
fiftieth percentile on the growth chart on his third birthday.

Dr.
Hollis diagnosed T.Q.F. with nonorganic failure to thrive after observing
T.Q.F.’s rapid weight gain on increased monitored calories, even though the
hospital did not diagnose T.Q.F. as failure to thrive on March 5, 2008, and
none of Mother’s other children had been diagnosed as failure to thrive.  Dr.
Hollis’s opinion was that T.Q.F.’s nonorganic failure to thrive was caused by
his not receiving an adequate amount of calories; T.Q.F. did not have a medical
problem that contributed to his failure to thrive.[43]

Dr.
Hollis testified that failure to thrive is caused by a systematic and ongoing
failure to act.  Dr. Hollis explained that a “failure to thrive” diagnosis
could be given to (1) a child who is below the third percentile on the growth
chart or (2) a child who has crossed two percentile lines and has fallen off
the growth chart.  Dr. Hollis testified that there are occasions when failure
to thrive can be recognized in a child just by looking at him, and there are
other occasions when that is not possible.  She said that one might have
suspicions that a child is failing to thrive, but it cannot be diagnosed from
looking at the child.  Dr. Hollis, however, admitted that she had made that
diagnosis the first time she saw T.Q.F. based on the foster mother’s
observation that he was wearing the same clothes as six months prior.

Although
T.Q.F. gained 0.6 pounds per month during the seven months that he was in
Mother’s care and only 0.5 pounds per month while he was in foster care, Dr.
Hollis testified that the failure to thrive happened only during the time that
Mother was caring for T.Q.F. because that was when he crossed two lines on the
growth chart.  Even if Dr. Hollis had used the growth chart for a premature
baby, T.Q.F. would have crossed more than two lines, supporting the basis for a
failure to thrive diagnosis.  Moreover, Dr. Hollis confirmed that a child who
is gaining weight can still be diagnosed as failure to thrive because failure
to thrive does not appear overnight; when a child is receiving calories but not
the appropriate type of calories, he might fall outside the growth chart and become
failure to thrive in three to six months.

Dr.
Hollis said that each case is individual and that in this case, T.Q.F. could
not find food, despite that the other children were not failing to thrive.  Dr.
Hollis said that depending on the condition of the family, how chaotic it is,
what their living situation is, and the child’s age, only one child in a large
family might be diagnosed as failure to thrive.

Dr.
Hollis opined that T.Q.F. was endangered because failure to thrive can be
fatal.  Dr. Hollis testified that Mother’s failure to seek treatment for a
child who was not growing constituted medical neglect and endangering conduct. 
Dr. Hollis testified that there can be long-term effects for failure to thrive
because it can permanently affect metabolism and intelligence.  Dr. Hollis said
that T.Q.F. is too young to know whether he will have long-term effects from
his failure to thrive.

Dr.
Hollis reviewed the photographs of the surroundings in which Mother’s children
lived, and Dr. Hollis testified that she believed J.G.K. was endangered by
living in such surroundings.  The food displayed in the pictures—meat was left
out on the counter—was unsafe for children.

D.      Johnson’s
Testimony

          1.       First
Meeting with Mother

Linda
Johnson, a caseworker with the Department, testified that her job was to
arrange and provide concrete services (like beds, money to obtain a birth
certificate, and clothing) to families who had cases with the Department.  Johnson
met Mother for the first time in April 2009 at the visitation during which
Mother stormed out and broke the door because she was mad about scratches on
J.G.K.’s face.  Mother yelled at Durham when Durham told her that she was being
inappropriate by yelling at her children.  After Mother left, Johnson spoke to
J.G.K. and investigated Mother’s concerns.  Johnson learned that J.G.K. had
scratched herself in her sleep, causing faint little markings on her face.  The
markings required no medical attention or first-aid treatment.  J.G.K. was
smiling and was not upset about the markings on her face, so Johnson did not understand
why Mother was upset.

          2.       Service
Plans

Johnson
testified that she was required by law to provide a service plan because none
of the exceptions in the family code applied.  When she took over the case from
Durham, she created a service plan and mailed it by regular mail (not certified
mail) to Mother’s attorney, but he never received it for some unknown reason.  Johnson
said that in hindsight it was a mistake to send the service plan to Mother’s
attorney and to expect him to go over it with her; Johnson admitted that she
should have gone over it with Mother in May 2008.  Johnson went over the
service plan for the first time with Mother at the October 2008 status hearing.
 It was not the “very first service plan” that Mother had ever seen because she
was already working services on her other children as of April 2008.  When
Johnson went over the service plan with Mother in October 2008, the
Department’s goal was reunification if it saw appropriate progress from Mother
in working her services.[44]

Mother
started working services on J.G.K.’s case in October 2008.  Mother’s plan
required her to obtain appropriate housing and a legal source of income, and
Johnson said that Mother completed those tasks.  However, Johnson said that
Mother did not complete her service plan because she did not maintain stability;
she failed to pay her rent and bills[45]
and was attempting to move again.  But Johnson agreed that Mother’s utility
issues at her current apartment—which included having her water, electricity,
and gas turned off at various times even though her rent included “all bills
paid”—constituted good reasons for a lease dispute and for her wanting to move.


Johnson
drafted another service plan for Mother[46]
when she lived at the mission and worked her services through CWJC; Mother had
not completed all of her services under the initial service plan and had not
appeared for all her visits.  Johnson never told Mother that if she worked all
of her services that all of her children would be returned to her.  Mother had
countless programs made available to her—including CWJC, Faith City Mission,
Social Security, Helen Farabee, counseling, and Supported Employment—but she
failed to make herself available for these services once she received her
Social Security lump sum check and monthly benefits.

          3.       Mother’s
Living Arrangements

Mother
would not tell Johnson where she was living in April 2008.  Johnson could not
effectively set up services and make home visits without knowing where Mother
lived.

Johnson
eventually learned that Mother lived with her cousin Darissa at 900 Juarez for
approximately a month.  Mother had to leave because Darissa’s boyfriend did not
like her and made Darissa choose between Mother or him; Darissa chose her
boyfriend and made Mother move out at 3 a.m.  Mother called Johnson the next
day and told her that she had been forced to move.

Following
one of her visitations at the CPS office, Mother told Johnson that she had
moved to the Sun Valley Apartments with a person named Ebony.  Mother did not
have her children living with her at that time.  Johnson testified that Reed had
taken pictures of the living room, kitchen, and bathroom at the Sun Valley
Apartments when Mother lived there and that those three rooms “looked better”
than the bedroom, a photo of which had been admitted into evidence.

Mother
had to leave Ebony’s apartment because Ebony had gotten in trouble with the
apartment’s management as a result of Mother’s not being listed on the lease of
the HUD apartment.  Even though every service plan required Mother to tell
Johnson where she was living, Mother did not do that, though she kept in fairly
regular contact with Johnson from March 2008 to September 2008.

In
August or September 2008, Mother moved into the mission while she was pregnant
with G.J.M.-B.  Johnson made visits to the mission and noted that Mother’s room
was very nice and that the mission provided Mother with clothing, toiletries,
and transportation.

4.       CPS’s Requirements for Mother While
She Lived at the Mission with G.J.M.-B.

In
November 2008, when Mother gave birth to G.J.M.-B., CPS started an
investigation because Mother had five children in the Department’s care.  At
the nonemergency removal hearing, the trial court ordered that the Department
be given managing conservatorship but that G.J.M.-B. be placed with Mother
under a monitored return.  The trial court did not say that Mother needed CPS’s
approval to move from the mission, but the trial court told Mother not to move
from the mission without getting prior approval from the attorney ad litem for
G.J.M.-B., from CASA, and from the trial court.

While
Mother was at the mission, she was required to keep G.J.M.-B. with her at all
times.  While Mother was living at the mission, she successfully completed the
CWJC, with the exception of obtaining her GED.  The CWJC set up a plan for
Mother to complete her GED because they wanted her to work toward that.  Mother
was given a mentor who was supposed to work with Mother on an ongoing basis to
prepare her for taking her GED, but the mentor never saw Mother again.  Mother
told Johnson that she had problems getting child care so that she could attend
classes; Johnson told Mother to get on the waiting list at Child Care,
Incorporated, but Mother did not do so.

Throughout
the time that Mother was at the mission, she was extremely diligent about
visiting with her other children, including J.G.K.  With the exception of when
Mother was bedridden prior to giving birth, she made all her visits and made up
any visits that were cancelled due to inclement weather.

While
G.J.M.-B. was in Mother’s care but in the Department’s custody, the trial court
ordered Mother to apply for Social Security benefits because Mother had previously
decided against applying.  Mother was successful in obtaining benefits on her
first try.  In May 2009, Mother received her lump sum award of $2,000 from
Social Security disability, and she moved out of the mission without obtaining
permission from the attorney ad litem for G.J.M.-B., from CASA, and from the
trial court.

          5.       Mother
Moved without Prior Approval

Johnson
and CASA discovered that Mother had moved to 1919 8th Street and went to that
address and knocked, but no one answered.  Johnson said that they were looking
in the windows because they were looking for G.J.M.-B. since the Department had
custody of her.  Johnson thereafter obtained an order from the trial court to
remove G.J.M.-B. from Mother because she had moved from the mission without
court approval.  Johnson removed G.J.M.-B. because Mother had violated the
trial court’s order, though Mother’s house was found to be satisfactory.

Johnson
said that Mother did well at the mission but that her situation became a
concern when she moved.  The Department was concerned about Mother’s ability to
provide for herself and for G.J.M.-B.

          6.       CPS’s
Attempts to Get Mother into the Housing Authority

Johnson
testified that instead of travelling to her son’s wedding on her day off, she
helped Mother get unbarred from the Housing Authority.  Johnson went to the
hearing and testified on Mother’s behalf because she wanted to help her obtain
affordable housing so that Mother would not have to spend so much of her
monthly check on housing.[47] 
The trial court wanted Mother to hold off on getting housing, but Mother spent
$500 a month on an apartment.  

          7.       Mother’s
Apartment Found Adequate and Home Visits

In
May 2009, the trial court found that the apartment was adequate and safe for
G.J.M.-B.  The Department was dismissed from the case at that time, and since
then, Mother had kept Johnson apprised of where she lived.  Johnson said that
she had visited the home because she had cases on Mother’s other five children.

Johnson
was present when Mother told the trial court that the mission gave her everything
and that she was able to keep the baby bed and the stroller.  Johnson learned
that was untrue when she visited Mother’s home and observed a “rickety” and
unsafe baby bed.  Johnson could not provide a baby bed because G.J.M.-B. was
not in the Department’s care.

Johnson
visited Mother’s home monthly during 2010 to see how she was doing.  Johnson
had seen T.M.J.’s father at Mother’s house three times and had seen Mother’s mother
at her house five times.  Johnson knew about T.M.J.’s father’s criminal
history, which included assault family violence, and was concerned that Mother
let him stay in her home with her child.

Johnson
noted that Mother kept up the apartment until right before trial when it had
become cluttered.  Johnson had also seen a hole the size of a fist in the wall
by the front door.  Johnson testified that she had checked the hole in the wall
near Mother’s door and determined that it was not caused by the door knob
because the two were not at the same height.  Johnson testified that this was
not the type of environment that J.G.K. should be sent back into.

Although
Mother had alleviated the Department’s concerns regarding the house she was
currently in at the time of trial, that house was not permanent as Mother was
in the process of being evicted.  Mother had managed to some extent because she
still had housing, but Johnson testified that less than a year of renting one
place was merely a start and that history was repeating itself since Mother was
being evicted from her residence, which caused the Department concern.

          8.       Visitations
with Children

During
most of the visits that Johnson observed at the visitation center, D.J.F. did
not stay in the room but wandered down the hall to another visitation room or went
to “hang out” with Olivia Carillo, the technician who monitored the door at the
visitation center.  Most of the time, Mother allowed D.J.F. to wander off and
did not go get her; Carillo had to bring her back.  Mother’s children usually referred
to Mother by her first name but sometimes called her “mama.”  Mother corrected
her children when they called her by her first name.

Johnson
had observed Mother tell J.G.K. that if she did not behave, Mother would tell
her foster parents; Johnson testified that such tactics were not appropriate
disciplinary procedures for a parent during a visitation.  Johnson said that,
in her opinion, it was inappropriate for Mother to threaten to tell the foster
parent because Mother was the parent and was in charge of the child during her
visitation time.  However, Johnson also testified that Mother had disciplined
her children at a visitation by putting them in time out, which was
appropriate.

Mother
was diligent in visiting prior to 2010, and it was not like her to leave a
visit early.  Johnson did not recall any visits that Mother had missed prior to
February 2010 because G.J.M.-B. or Mother was sick.  Johnson said that the
termination trial was the first time she had heard of Mother’s illnesses.  It
was also the first time that Johnson had learned that Mother had gone shopping
in Lawton in lieu of visiting her children.

9.       Mother’s Anger Issues

Johnson
believed that Mother’s reaction toward the scratches on J.G.K.’s face showed
her instability and her inability to control her anger.  Johnson said that
Mother’s reaction gave the Department concern regarding placing a child in her
home.  Johnson testified that since September 2009, Mother had been less
volatile and had not yelled at her children as often.  But Mother had lost her
temper with adults since September 2009, including yelling at Carillo; Safe
Harbor, which CPS contracted with to transport the children to the visits; and
caseworkers, including Johnson.  Mother had also yelled at J.G.K.’s foster mother
at the visitation center.  Johnson thought that in recent months Mother seemed
not as easily angered; she still had outbursts, but they were fewer.  Johnson
had no personal knowledge of Mother ever physically hitting her children.

In
August 2009, Mother called Johnson asking for money so that she could get
unbarred from the Housing Authority, and Mother became angry when she learned
that Johnson could not give her that money.  Mother yelled at Johnson and hung
up on her.

Johnson
believed that Mother’s actions were not indicative of someone who would do
anything for her children.  Mother’s actions revealed that her medication did
not keep her calm at all times, prevent her from getting angry, or help her
maintain stable emotion.

          10.     Mother’s
Finances

When
Mother told Johnson how difficult it was to pay her bills on $675 a month and
housing of $500, Johnson suggested that Mother get into the Housing Authority
and supplement her income by gaining employment through the Supported Employment
program at Helen Farabee, which would not cause her to lose her disability
benefits.  All that was required of Mother was that she make and keep an
appointment and complete the paperwork.  Helen Farabee made an appointment for
Mother, but she failed to keep it.  Johnson was not surprised that Mother’s spending
exceeded her income.

Johnson
had heard that Mother could not take classes nor get a job because no one would
take care of G.J.M.-B.  This was in contrast to testimony from prior hearings that
everyone wanted to babysit G.J.M.-B. “at the drop of a hat.”  However, Mother
was not required to get a job after she procured Social Security disability
benefits.

Johnson
delivered six budget forms to Mother for her to complete to help her understand
that with each child, the cost would become exponentially greater.  Johnson
asked Mother to prepare a budget under the scenario if she had one child living
with her and then if she had two children living with her, and so forth,
so that she would have an understanding of how much money it would cost with
each child.  Mother’s budgets, which increased by only five or ten dollars per
month with the addition of each child, showed that she did not understand how
much having additional children at home would cost.  Johnson did not know prior
to Mother’s testimony that she had dropped her WIC.  Johnson said that WIC
could have supplemented Mother’s food stamps.

Johnson
found out about Mother’s monetary problems and her eviction at the trial
because Mother did not tell Johnson that the eviction had been filed.  The
pending eviction plus the fact that Mother had been relying on money from
T.M.J.’s father raised questions about her stability during the year preceding
the trial.  Johnson believed that Mother should have taken advantage of
government programs that were available to help her.  Johnson did not believe
that Mother had been responsible with her money.

          11.     Mother’s
Car

Mother
told Johnson that she had bought a car, but she did not tell Johnson that she
was paying for it monthly and that she did not have car insurance or a drivers’
license.  Had Mother talked to Johnson prior to buying the car, Johnson would
have tried to dissuade her from buying a vehicle she could not afford and would
have continued to provide her with bus passes.  Johnson testified that Mother
stopped receiving bus passes in February 2010 because she had a car.  Johnson
agreed that having transportation was a good thing only if it was within
Mother’s financial means and she had the ability to carry insurance and a legal
means of operating the transportation.

          12.     Status
of Mother’s Other Cases

The
Department accepted permanent managing conservatorship of D.J.F., T.M.J., and J.K.P.
because it was running out of time to resolve the cases.  The Department’s
position was that it did not recommend that Mother be given D.J.F., T.M.J., and
J.K.P.  Johnson testified that the Department planned to file new petitions to
terminate Mother’s parental rights to those three children at the conclusion of
J.G.K.’s case.

Johnson
knew that J.K.P. had serious problems and had been in a psychiatric hospital in
the last year.  Johnson testified that all the days of school that J.K.P.
missed adversely affected him, that he had been held back at least once, that
he was having a hard time in school, and that he was in a special program at
school and was trying to catch up.

As
far as Johnson could tell, Mother was a good mother to G.J.M.-B., and Johnson felt
G.J.M.-B. should stay in Mother’s care.

          13.     J.G.K.’s
Case

In
March 2008, J.G.K.’s case started anew, while the other children were involved
in monitored returns.  At the time of the termination trial, J.G.K. had spent most
of her life in foster care, away from Mother.  Johnson testified that J.G.K. was
a normal child who did not have special needs.  She lived in Graham and did
well in school and was in the first grade.  J.G.K. started school late but had
caught up.  There were no discipline problems in school.

J.G.K.’s
foster parents also had D.J.F. in their home.  The two sisters got along well
together.  There was an older adopted daughter in the home, and the three girls
got along well.  The foster mother cared for J.G.K. prior to her case being dismissed
in August 2007, and J.G.K. moved back in with the foster mother in July 2008.  J.G.K.
and the foster mother have a loving relationship.  Johnson testified that
J.G.K. and D.J.F. visit frequently with T.M.J. because their foster mothers are
friends.[48]

Johnson
had witnessed J.G.K. reacting badly during a visit with Mother and knew of
times when J.G.K. did not want to attend visitation.

          14.     CPS’s
Recommendation for J.G.K.

Mother
had received more than four chances with the Department.[49]  Johnson testified that all
of the chances Mother had received as of the time of the termination trial were
to the detriment of her children and that it would not be in the children’s
best interest to continue giving Mother chances.  Mother testified that CPS
became involved with J.K.P. after Mother smoked marijuana and passed out, which
was Mother’s first chance.  When D.J.F. went to the hospital and the children
were removed, that was Mother’s second chance.  When T.Q.F. was removed because
Mother tested positive for cocaine, that was her third chance.[50]  All of the children were
returned to Mother in August 2007 but were later removed, and that was her
fourth chance.  After the children were removed again, Mother went to the
mission and worked services through the CWJC but Mother did not following the trial
court’s rules, which was her fifth chance.  After her fifth chance, Mother
failed to demonstrate that she had learned her lesson and had become stable and
responsible.  During the two years that Johnson worked the case, she never
heard Mother accept responsibility.

Johnson
agreed that Mother’s irresponsibility resulted in the pattern that was seen in
her past and that was currently repeating itself as of the time of the trial.  Johnson
believed that the instability and irresponsibility in Mother’s life endangered
the children.  Johnson testified that Mother had not shown stable housing or
the ability to provide for herself because Mother relied on others to make up
the gaps in her budget as a result of her irresponsibility in utilizing her
financial resources.  Johnson was not opposed to Mother’s taking advantage of
government programs but thought the most appropriate thing would be for Mother
to live within her means.

Johnson
did not dispute Mother’s testimony that G.J.M.-B. was doing well, but the fact
that Mother was doing well with G.J.M.-B. did not change the Department’s
opinion of Mother’s parenting abilities regarding J.G.K.  Johnson asked the
jury to terminate Mother’s parental rights because she believed it was in
J.G.K.’s best interest and would provide closure and finality for her.  Johnson
said that her recommendation regarding best interest included J.G.K.’s desires.

Johnson
testified that it was the Department’s plan to allow the foster mother to adopt
J.G.K. if Mother’s parental rights were terminated.  Johnson testified that the
foster mother could provide for J.G.K.

E.      CPS
Investigator’s Testimony

Patrick
Barber, an investigator with CPS, testified that he was assigned to check on
Mother and G.J.M.-B. after she was born.  Barber said that G.J.M.-B. did not
test positive for drugs and was a healthy baby; there were no allegations of
abuse of G.J.M.-B. at that time.  Barber met Mother and G.J.M.-B. at United
Regional Hospital right after delivery and spoke with Mother regarding where
she planned to live.  Barber learned that Mother was planning to return to
Faith City Mission with the baby.  Barber visited Mother at the mission later
that same week and found that Mother had “a lot of stuff for the baby.”

Due
to Mother’s extensive history with the Department,[51]
they were concerned about G.J.M.-B.’s welfare and, at one point, decided that
it would be in the child’s best interest to seek a removal.  The
Department initially sought an emergency removal around November 19, 2009.  The
Department later tried a nonemergency removal, and the trial court gave custody
to the Department but allowed G.J.M.-B. to stay with Mother.

Barber
met with Mother three more times at the mission but did not find anything
inappropriate; Mother was doing all the things that a mother should do for her
newborn.  Barber said that he had testified at a hearing involving G.J.M.-B.
and had recommended that G.J.M.-B. was safe and that Mother had everything that
she needed for G.J.M.-B. at that time; she was not in an emergency,
life-threatening position.

F.       Mission
Director’s Testimony

John
Welter, the director of Wichita Falls Faith City Mission, testified that he was
familiar with Mother because she came to the mission when she was homeless and
spent September 2008 through summer 2009 at the mission.  Welter
said that Mother had stayed at the mission on several different occasions and
that she was barred from the mission at several different times.  Welter
said that when Mother first arrived at the mission, “most of the time [he]
wanted to bury her out in the backyard”; there was daily conflict because she
was not willing to abide by the rules.  But the last time that Mother stayed at
the mission, “it was like some miracle had changed her to where she became a
person who was willing to do whatever it took.  It was a complete change of her
personality.”

Welter
testified that after Mother gave birth to G.J.M.-B., she moved into a family
room with her at the mission.  Welter described Mother as “[a] doting
mother” of G.J.M.-B. and said that she properly nurtured and fed her.  Mother
followed the rules of the mission.  When Mother wanted to leave the mission, Welter
had a conversation with Mother about staying at the mission for three or four
weeks to see if she could get unbarred at the Housing Authority so that she could
avoid paying $500 in rent each month for an apartment.

Welter
was surprised that Mother had lied under oath by testifying that the mission
had given her a baby bed, that she had moved out of the mission, and that she
had paid off a car.  Welter was surprised that Mother went shopping and missed
a visit with her children after not having seen her children in a month due to
illness and weather cancellations.  Welter was also surprised to learn that
Mother had entered into a sexual relationship with T.M.J.’s father, whom she
had previously obtained a protective order against in 2005 and who was in jail
again for violating the conditions of his deferred adjudication community
supervision for his assault family violence charge.  Welter was not surprised
that Mother’s expenses were 150% of her income.  He said that it would
disappoint him to know that Mother was over budget because she was paying off
tickets that she had received for driving without a license.  Welter said that
he would not be surprised to learn that Mother was in the process of being
evicted.  Welter agreed that all of the preceding
events had happened after he thought that Mother’s demeanor had changed and
that she was willing to do whatever it took to have her children returned.

Welter
was pleased to hear that Mother had been in her lease for almost a year, that
she was taking her prescribed medications, that she had two other residences
lined up in the event of an eviction, that she had fought for her children and had
never given up, and that she had a legal source of income.  Welter testified
that Mother was a success because she had not lived at the mission for eleven
months.

G.      Mother’s
Landlady’s Testimony

Mandy
Blevins testified that she was the landlady for Mother at the 1919 8th Street
address where Mother lived at the time of the termination trial.  When Mother
rented the apartment in May 2009, Blevins told Mother that it was not ready,
but Mother said that she needed to find a place for her and her baby because
CPS did not like Mother’s being at the homeless shelter with her child.  Blevins
said that she was fixing “the stuff that absolutely needed to be fixed at that
time” so that the apartment could be inspected by CPS and CASA.

Blevins
said that Mother’s rent was $500 per month and included gas, water, and
electricity.  Blevins confirmed that Mother’s lease required her to make
repairs that cost less than $50 and to submit repair requests in writing.  Blevins
opined that putting a closet door back on its hinges would cost less than $50
and so would repairing the kitchen cabinet door that was off its hinges and
removing rust stains from the bathtub.  Blevins testified that she had not
received any repair requests in writing from Mother.

Blevins
said that Mother had informed her about holes in the wall “the other day.”  All
previous holes had been patched with drywall or the sheetrock had been replaced,
so Blevins was not aware of any holes that were present in the bedroom when
Mother moved in.  Blevins testified that the repair made to the kitchen floor
was done to replace a pipe, that plywood (the same subflooring used in the rest
of the apartment) had been used to cover the hole, and that the only thing
missing was the “stick tile or whatever that’s also through the house.”  Blevins
said that the plywood in the kitchen had not been covered after the repair due
to “oversight.”  Blevins said that the notice from the city that she had received
regarding housing code violations listed lack of smoke detectors.  Blevins said
that smoke detectors were present when Mother moved in, but Blevins had later found
one smashed on Mother’s front porch.

Blevins
admitted that she had encountered problems with the electric company and the
gas company because the bills were not in her name, but she said that the
electricity and gas did not stay off very often for very long.  Blevins
admitted that Mother’s water heater was not working “for a while” and that Mother’s
attorney had called regarding that problem.  Blevins said that on a couple of
occasions, she had tried to send people to repair Mother’s water heater, but
Mother had refused to let them come in her house.  Blevins admitted that
Mother’s water was turned off once or twice for nonpayment due to water leaks
that caused a $600 bill, which Blevins was in the process of paying.  Blevins
said that the water “got readily turned back on.”  Blevins admitted that Mother’s
property had not been exterminated; Blevins had provided “bombs and Combat gel”
to the other residents but not to Mother due to her hostility.

Blevins
said that initially she had no problems with Mother but that it later “seemed
like nothing was ever right, nothing was ever good enough,” and Blevins
received texts with obscenities from Mother.  Blevins said that every time she
tried to help Mother, she had been cursed or threatened.  Blevins had also received
complaints from Mother’s neighbors that she had cursed at them and yelled at
them.

Blevins
said that once when she went by to pick up Mother’s rent payment, Mother was
sitting on her couch with a black eye and told Blevins that her brother had hit
her but that she had told CPS a different story.  The weekend before the trial,
Blevins heard Mother’s brother Prentice talking about beating up a girl over
the weekend and saying that Mother had pictures of her face.

Blevins
testified that there have been a few times when Mother has not paid the full
amount of rent.  Blevins noticed that Mother’s rent payment became erratic in
January or February of 2010; Mother told her that her car was in the shop and
that she had to get it fixed.  Blevins started charging Mother late fees in
April 2010.  At the time of the trial on May 20, 2010, Mother owed $495 in rent
plus late fees.

Blevins
had started eviction proceedings against Mother and had given her an eviction
notice on April 20, 2010, with three days’ notice to vacate.  Mother responded
to the eviction notice by yelling at Blevins during a phone call and
questioning why Blevins was evicting her.  Mother called code enforcement the
next day.  The eviction hearing was set for May 19, 2010, during the
termination trial.  Blevins’s husband received a phone call right before the
eviction hearing, notifying him that Mother’s attorney had filed a continuance.
 Blevins testified that she intended to follow through with the eviction.  Blevins
said that in the event that the eviction did not go through, she did not plan
to renew Mother’s lease.

Blevins
said that only Mother and her child are supposed to be staying in the
apartment, but Blevins was aware that Mother’s mother, brother, and sister had
stayed for longer than a day.  Blevins said Mother’s mother was staying with
her in December 2009 to help her out.  Blevins admitted that the lease did not
prohibit overnight guests.

Blevins
agreed that Mother loves G.J.M.-B. and was appropriate with her.  Blevins said
that due to Mother’s failure to pay rent, she could have turned off the
electricity but chose not to because of G.J.M.-B.

H.      CASA
Worker’s Testimony

Mauri
Reed testified that she was employed by CASA and had been involved with J.G.K.
for almost two years as her CASA worker.  Reed described J.G.K. as 

a precious little
girl.  She is very shy upon initially meeting her.  She’s smart.  She’s
inquisitive.  It takes her a while to get used to you.  She loves writing.  She
is mastering reading right now.  She struggles in reading.  She loves school. 
She loves her foster mom.  She’s a teacher.  She loves her foster sisters, and
currently she’s playing softball for The Crush.

Reed
disagreed with the description of J.G.K. as a people pleaser; she countered, “I
think she’s a shy little girl, but I don’t necessarily -- I think she
understands more than, you know, you give her credit for.  I think -- I think
she knows what she wants [i.e., to be adopted by her foster parents].”  J.G.K.
had never told Reed that she did not love Mother.  However, she told Reed that
she was scared of Mother, that Mother was loud and yelled a lot, and that she did
not want to see Mother anymore.  Reed had not seen Mother yell at J.G.K. during
a visit, but she had witnessed Mother raise her voice.  Reed said that it was a
fight every week to get J.G.K. to go to visit Mother and that J.G.K. had told
her that she “doesn’t ever want to visit her mommy anymore.”

Reed
did not think that Mother had been diligent with her visitation in 2010.  With
regard to the visits Mother had missed, Reed did some investigation and did not
believe that Mother and G.J.M.-B. were ill during all of the missed visits.  Reed
said that she went to Mother’s house after she missed a visit and was told by T.M.J.’s
father and Mother’s brother that Mother and G.J.M.-B. were not there—even
though Reed heard a baby inside the home—and that they had not been sick.

Reed
testified that Mother had asked both CPS and CASA for help and had asked Reed
for rides.  Reed took Mother to the Social Security office, and Mother received
her disability income.  Reed also took Mother to the Social Security office to
obtain a Social Security card for G.J.M.-B.  Reed said that Mother had asked
CASA for so many things that she was no longer allowed to give her any more
concrete services because she had “surpassed any other client that we’ve ever
had.  We’ve helped her more than any other one.”  Reed said that it can be a
positive and a negative for clients to ask for help because clients need to
learn how to get help to prepare for when CASA is no longer part of their
lives. 

Reed
saw Mother’s home after she first moved in and told Mother the repairs that
needed to be made; Mother made them.  Thereafter, Reed testified in T.Q.F.’s
case, and Reed’s relationship with Mother deteriorated.  Reed said that Mother
had often become belligerent, rude, and pouty; had hung up on her; and had a
violent demeanor at times.  Reed had seen an improvement in Mother’s demeanor,
but the angry demeanor was still present.  Mother had threatened by text that
she would call the police if Reed came to her house anymore.  Mother also
called Reed’s supervisors and complained about her.  Reed had explained to
Mother that she was required to visit Mother’s house, but Mother did not care.  Reed
had gone to Mother’s house four times since she had moved into the house, but
Mother had refused to let her in.  The last time Mother allowed Reed to come in
her house was May 2009.  Reed was concerned that Mother had engaged in a
relationship with T.M.J.’s father again and found out about it when she saw him
at Mother’s residence.  Reed learned about Mother’s eviction the week before the
trial, and it concerned her.

Reed
did not dispute that Mother loved her children, but Reed had sat through all of
the trials and had not heard anything that made her believe that Mother had truly
changed.  Reed did not believe that Mother’s actions were indicative of someone
who would do whatever it took to have her children returned.

Moreover,
J.G.K. did not want to go back to Mother; she wanted to stay with her foster
family.  Reed testified that if J.G.K. was taken out of her foster home and was
placed with Mother that it would be emotionally detrimental to her, that the
progress she had made with her foster family would be wiped out, and that she
would revert back substantially.

          I.        Jury’s
Verdict 

After
hearing the above evidence, the jury found by clear and convincing evidence (1)
that Mother had knowingly placed or knowingly allowed J.G.K. to remain in
conditions or surroundings that endangered her physical or emotional well-being,
(2) that Mother had engaged in conduct or knowingly placed J.G.K. with persons
who engaged in conduct that endangered her physical or emotional well-being,
and (3) that it would be in J.G.K.’s best interest to terminate Mother’s
parental rights to J.G.K.  The trial court received the jury’s verdict as
tendered and signed a decree of termination.  This appeal followed.

III.  Mother’s Due Process Rights Were Not Violated

          In
her first and second issues, Mother argues that the trial court denied her due
process and abused its discretion by denying her pretrial motion to dismiss for
due process violations.  Specifically, Mother argues that (1) no temporary
orders were reduced to writing following the adversary hearing; (2) Mother’s
rights were prejudiced when two cases were tried separately, despite a
consolidation order; (3) the service plan was not discussed with Mother until
October 2, 2008, which deprived Mother of four months’ time to work her plan;
(4) no status hearing was ever held as required by family code section 263.106;
(5) no hearing was held on the motion to retain, which deprived her of her due
process right to appear and contest the findings required for extension by family
code section 263.401; (6) no extraordinary circumstances existed to retain the
suit on the trial court’s docket; and (7) the previous complaints, individually
and in sum, denied Mother the procedural guarantees of the Texas Family Code to
such an extent that her due process rights were violated.  We previously
addressed Mother’s similar due process complaints in a case involving one of
her other children in T.T.F., 331 S.W.3d at 474–80, and we cite heavily
to that case for our analysis here.

A.      Not Reducing Temporary Orders to
Writing Following Adversary Hearing

Mother
argues that the trial court violated her procedural due process rights by
failing to issue written temporary orders following the March 27, 2008
adversary hearing.  Specifically, Mother contends that “[p]rior to the time the
original Associate Court bench trial began, there was no record of the
Adversary Hearing; therefore the terms and conditions by which [Mother was] to
obtain return of the child were not known.”  Mother states that temporary orders
were not signed until August 21, 2009, and were not filed until September 3,
2009.  We set forth the law in T.T.F. as follows,

Family
code section 262.201(a) requires the trial court to conduct a full adversary
hearing no later than fourteen days after the governmental entity takes
possession of the child.  Tex. Fam. Code Ann. § 262.201(a) ([West] Supp. 2010). 
Section 262.201(b)(1) requires the trial court to order the child returned
unless the court finds sufficient evidence of (1) a danger to the child’s
physical health or safety that “was caused by an act or failure to act of the
person entitled to possession” and that “for the child to remain in the home is
contrary to the welfare of the child.”  Id. § 262.201(b).

331
S.W.3d at 476–77.  

Mother’s
complaint is that the trial court did not issue a written order setting forth
the terms and conditions under which she could regain possession of J.G.K.  But
section 262.201 does not require the trial court to issue an order following
the adversary hearing that sets forth the terms and conditions under which she
could regain possession of the child.  See generally Tex. Fam. Code Ann.
§ 262.201(a)–(g).  Therefore, we hold that the trial court did not violate
Mother’s procedural due process rights by failing to issue a written order
setting forth the terms and conditions under which Mother could regain
possession of J.G.K.  See T.T.F., 331 S.W.3d at 477.  We overrule this
part of Mother’s first issue.

B.      Separate
Trials

Mother
next argues that the trial court consolidated this case with a different case
involving another of Mother’s children (T.Q.F.) but denied her right to
procedural due process by subsequently conducting separate trials.  She argues
that her rights were prejudiced by the trial court’s failure to conduct a joint
trial.

We
set forth the law in T.T.F. as follows,

A
severance splits a single suit into two or more independent actions, each
action resulting in an appealable final judgment.  Van Dyke v. Boswell,
O’Toole, Davis & Pickering, 697 S.W.2d 381, 383 (Tex. 1985); Aviation
Composite Techs., Inc. v. CLB Corp., 131 S.W.3d 181, 188 (Tex. App.—Fort
Worth 2004, no pet.).  Severance of claims under the Texas Rules of Civil
Procedure rests within the sound discretion of the trial court.  Liberty
Nat’l Fire Ins. Co. v. Akin, 927 S.W.2d 627, 629 (Tex. 1996) (orig.
proceeding); Aviation Composite Techs., 131 S.W.3d at 188.  The
controlling reasons for a severance are to do justice, avoid prejudice, and
further convenience.  Guar. Fed. Sav. Bank v. Horseshoe Operating Co.,
793 S.W.2d 652, 658 (Tex. 1990) (op. on reh’g); Aviation Composite Techs.,
131 S.W.3d at 188.

331
S.W.3d at 477.

Here,
as in T.T.F., Mother has not provided any support for her contention
that her rights were prejudiced by conducting separate trials.  In her brief in
this court, the totality of Mother’s prejudice argument states:  

By Order of the
referring Court, the two causes were to be tried jointly, and without such
joint trial, Respondent-Mother’s rights were prejudiced.  The children in the
different causes had different attorneys ad litem, as did the
Respondent-Fathers.  The Order consolidating the two causes was not appealed by
the Department, and Respondent-Mother was entitled to have the two causes tried
together.

Because
the severance of claims rests within the sound discretion of the trial court;
because the primary reasons for a severance are to do justice, avoid prejudice,
and further convenience; and because Mother has not established any prejudice that
she suffered from the separate trials, we hold that the trial court did not deny
Mother due process by conducting separate trials.  See id. at 477–78; see
also Tex. R. App. P. 38.1(h) (requiring a clear and concise argument with
appropriate citations to legal authorities); Fredonia State Bank v. Gen. Am.
Life Ins. Co., 881 S.W.2d 279, 284 (Tex. 1994) (noting long-standing rule
that a point may be waived due to inadequate briefing).  We overrule this
portion of Mother’s first issue.

C.      No
Signed Service Plan within Forty-Five Days of Adversary Hearing

 

Mother
also argues that her procedural due process rights were violated because the
Department did not obtain her signature on the service plan it filed after the
March 27, 2008 adversary hearing.  She contends that the service plan was not
effective until she reviewed and signed it with the caseworker on October 2,
2008, and that the delay deprived her of four months of time to work on her
service plan.

We
set forth the law in T.T.F. as follows,

Family
code section 263.101 requires the Department to file a service plan no later
than the forty-fifth day after the trial court renders a temporary order
appointing the Department as the temporary managing conservator.  Tex. Fam.
Code Ann. § 263.101 ([West] 2008).  Section 263.103(c), however, permits the
Department to file the service plan without the parent’s signature if it
“determines that the child’s parents are unable or unwilling to sign the
service plan.”  Id. § 263.103(c) ([West] 2008).  Section
263.103(d)(2) in turn provides that the service plan takes effect when the
Department “files the plan without the parents’ signatures.”  Id. § 263.103(d).

331 S.W.3d at 478.

 

Here,
Johnson testified that when she took over the case in March 2008, she created a
service plan and mailed it by regular mail (not certified mail) to Mother’s
attorney.  Johnson said that in hindsight it was a mistake to send the service
plan to Mother’s attorney and to expect him to go over it with Mother.  Johnson
said that she went over the service plan for the first time with Mother at the
October 2008 status hearing.

But
Johnson testified that this was not the “very first service plan” that Mother
had ever seen because she was already working services on the other children as
of April 2008.  See id. (stating that Mother’s service plan took effect
when the Department filed it on April 29, 2008, without Mother’s signature,
even though Mother did not go over the plan with her attorney until May 18,
2008).  The State notes in its supplemental brief that Mother’s service plan in
this case, like the one in T.T.F., required her to attend counseling and
parenting classes, and Mother went over that plan with her caseworker in May
2008.  According to a permanency progress report, appointments were set up in
June and July 2008 for Mother to attend counseling and parenting classes, but
Mother no-showed.

The
State also notes that Mother had been volatile at the time of the filing of the
service plan due to the re-removal of T.Q.F. and that was the reason the
Department filed the service plan without Mother’s signature.  See id.; see
also Tex. Fam. Code Ann. § 263.103(c) (providing that service plan may be
filed without parent’s signature if parent is unwilling or unable to sign it).
Furthermore, Mother’s parental rights were not terminated pursuant to a
finding under Texas Family Code section 161.001(1)(O) for failing to comply
with a provision of a court order.  See Tex. Fam. Code Ann. § 161.001(1)(O).

On
these facts, we hold that the service plan pertaining to J.G.K. that was filed
on April 29, 2008, without Mother’s signature, and which became effective on
that date, did not violate Mother’s procedural due process rights.  See
T.T.F., 331 S.W.3d at 478; see also Tex. Fam. Code Ann. § 263.103(c),
(d).  We overrule this part of Mother’s first issue.

D.      Lack
of Status Hearings 

Mother
also argues that the trial court violated her procedural due process rights by
not conducting a status hearing within sixty days of the initial temporary
order in violation of Texas Family Code section 263.106.  Specifically, Mother
argues that no status hearing was ever held in this case and that no hearings
were held until the permanency hearing on March 30, 2009, over a year after the
March 27, 2008 adversary hearing.  Mother misstates the procedural history:  a
status hearing was held on October 2, 2008; an initial permanency hearing was
held on March 30, 2009; and a subsequent permanency hearing was held on July
20, 2009.

          Family
code section 263.201(a), not section 263.106, sets forth the time during which
the status hearing is to be held.  Section 263.201(a) requires the trial court
to “hold a status hearing to review the child’s status and the service plan
developed for the child” no later than sixty days after the trial court renders
a temporary order appointing the Department as temporary managing conservator
of the child.  Tex. Fam. Code Ann. § 263.201(a) (West 2008).  Similarly,
section 263.304(a) requires the trial court to conduct an initial permanency
hearing within 180 days of the temporary order.  Id. § 263.304(a) (West
2008).  Finally, section 263.305 requires the trial court to conduct subsequent
permanency hearings within 120 days of the most recent permanency hearing.  Id.
§ 263.305 (West 2008).  It is undisputed that the trial court did not conduct a
status hearing within sixty days of the temporary order, an initial permanency
hearing within 180 days of the temporary order, or subsequent permanency
hearings within 120 days of the most recent permanency hearings.[52]

          As
we stated in T.T.F.,

          In a
slightly different context, this court held in In re E.D.L., 105 S.W.3d
679, 688 (Tex. App.—Fort Worth 2003, pet. denied), that although family code
section 262.201(a) requires a trial court to conduct a full adversary hearing
within fourteen days of the date a governmental entity takes possession of a
child, the requirement is procedural, not jurisdictional.  In part because
section 262.201 does not contain a remedy for failing to conduct a full
adversary hearing in a timely manner, we held that the failure to timely
conduct a full adversary hearing did not require dismissal of the termination
proceeding.  See id. at 686–88.  We also held that both the Department
and the parent had “the right to compel the trial court by mandamus to conduct
the adversary hearing promptly.”  Id. at 688.

331
S.W.3d at 479.

          Here,
although Mother contends that her procedural due process rights were violated
and does not ask us to hold that the trial court should have dismissed the case
once it did not timely conduct a status hearing, an initial permanency hearing,
or subsequent permanency hearings, we believe the reasons for our holdings in E.D.L.
and T.T.F. apply in this case.  Sections 263.201 and 263.305 do not
contain remedies for the failure to timely hold a status hearing or a
subsequent permanency hearing, and section 263.304(b) specifically provides
that any party to the suit may compel the trial court, by mandamus, to comply
with its obligation to conduct an initial permanency hearing within the
statutory deadline.  See Tex. Fam. Code Ann. §§ 263.301, .304(b), .305. 
Thus, under the plain language of section 263.304(b) and the reasoning in E.D.L.
and T.T.F., Mother could have sought to enforce her procedural right to
a timely status hearing, a timely initial permanency hearing, and timely
subsequent permanency hearings by mandamus.  See Tex. Fam. Code Ann. §
263.304(b); T.T.F., 331 S.W.3d at 479; E.D.L., 105 S.W.3d at
688.  But Mother did not seek mandamus relief or otherwise complain to the
trial court in a timely manner about its failure to conduct the hearings.[53] 
See In re N.V.D., 102 S.W.3d 268, 269–70 (Tex. App.—Beaumont 2003, pet.
denied) (acknowledging trial court’s failure to timely conduct a subsequent
permanency hearing, noting that parent did not seek mandamus and that trial
court conducted subsequent permanency hearing as soon as delay was brought to
its attention, and holding that error was harmless because parent did not
demonstrate that error probably caused rendition of an improper judgment).  Because
Mother did not seek mandamus relief, she cannot complain on appeal that she was
denied procedural due process in the trial court.  See id.

Moreover,
Mother has also failed to show that she was harmed by the trial court’s failure
to timely conduct the status hearing, the initial permanency hearing, or the
subsequent permanency hearings.  Indeed, she makes no argument at all
concerning harm, and she makes no complaint concerning anything that occurred
at the status hearing, the initial permanency hearing, or the subsequent
permanency hearing.  “[T]he remedy for a denial of due process is due
process.”  Univ. of Tex. Med. Sch. at Houston v. Than, 901 S.W.2d 926,
933 (Tex. 1995) (citing Perry v. Sindermann, 408 U.S. 593, 603, 92 S.
Ct. 2694, 2700–01 (1972)).  Recalling that the trial court did, albeit in an
untimely manner, conduct a status hearing, an initial permanency hearing, and a
subsequent permanency hearing, we hold that Mother is not entitled to relief
for the trial court’s failure to timely conduct the hearings because Mother
already received the process she was due.  On these facts, we hold that the
trial court did not violate Mother’s procedural due process rights by failing
to timely conduct the status hearing, the initial permanency hearing, or the
subsequent permanency hearings.  We overrule this part of Mother’s first issue.

E.      Retention
of Suit on Docket for Extraordinary Circumstances

Mother
argues that her due process rights were violated because the trial court did
not conduct a hearing before retaining the case on the docket beyond the initial
one-year dismissal date.

The
one-year dismissal date in this case was March 9, 2009.  The Department filed a
motion on March 4, 2009, requesting that the trial court retain the case on the
trial court’s docket and set a new dismissal date pursuant to family code
section 263.401(b); the Department did not request a hearing on its motion.  Mother
did not file a response to the Department’s motion, nor did she seek mandamus
to compel the trial of her case before the statutory deadline.  On March 5,
2009, without holding a hearing, the trial court issued an order retaining the
suit on the docket, setting a new dismissal date of September 5, 2009, and
setting the next permanency hearing for March 30, 2009.  The trial court did
not cite any specific extraordinary circumstances in its order, stating only
“that extraordinary circumstances necessitate the child remaining in the
temporary managing conservatorship of the Department and that continuing the
appointment of the Department as temporary managing conservator is in the best
interest of the child.”  Mother did not file a motion for reconsideration of
the retention order, nor did she file any motion challenging the trial court’s
holding the permanency hearings on March 30, 2009, and July 20, 2009, or
challenging the trial court’s setting a trial date of September 3, 2009. 
Mother first protested the trial court’s retention of the case on August 18,
2009, in her motion to dismiss.

We
set forth the law in T.T.F. as follows,

In
relevant part, family code section 263.401 states:

(a) Unless the court
has commenced the trial on the merits or granted an extension under Subsection
(b), on the first Monday after the first anniversary of the date the court
rendered a temporary order appointing the department as temporary managing
conservator, the court shall dismiss the suit affecting the parent-child
relationship filed by the department that requests termination of the
parent-child relationship or requests that the department be named conservator
of the child.

 

(b) Unless the court
has commenced the trial on the merits, the court may not retain the suit on the
court’s docket after the time described by Subsection (a) unless the court
finds that extraordinary circumstances necessitate the child remaining in the
temporary managing conservatorship of the department and that continuing the
appointment of the department as temporary managing conservator is in the best
interest of the child.

 

Tex.
Family Code Ann. § 263.401(a), (b) (West 2008).

331
S.W.3d at 474–75.

We
strictly construe statutes concerning involuntary termination of parental
rights in favor of parents.  Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985); In re A.V., 849 S.W.2d 393, 400 (Tex. App.—Fort Worth 1993, no
writ).  Our primary objective in construing a statute, however, is to determine
and give effect to the legislature’s intent.  Phillips v. Beaber, 995
S.W.2d 655, 658 (Tex. 1999).  In determining the legislature’s intent, we look
first to the statute’s plain and common meaning and presume that the
legislature intended the plain meaning of its words.  Fleming Foods of Tex.,
Inc. v. Rylander, 6 S.W.3d 278, 282 (Tex. 1999).  We also presume that the
legislature chose its words carefully, recognizing that every word in a statute
was included for some purpose and that every word excluded was omitted for a
purpose.  In re M.J.M.L., 31 S.W.3d 347, 354 (Tex. App.—San Antonio
2000, pet. denied); Renaissance Park v. Davila, 27 S.W.3d 252, 257 (Tex.
App.—Austin 2000, no pet.).

Mother
argues that the trial court violated her procedural due process rights by not
conducting a hearing before granting an extension for extraordinary
circumstances, but the plain language of section 263.401 does not require the
trial court to conduct a hearing before granting an extension.  See Tex.
Fam. Code Ann. § 263.401(a), (b).  Thus, we must presume that the legislature
did not intend to require a hearing before the trial court retains a case on
its docket pursuant to section 263.401(b).  See id. § 263.401(b); M.J.M.L.,
31 S.W.3d at 354; Renaissance Park, 27 S.W.3d at 256.  Moreover, we note
that this court has previously held that section 263.401(b) does not require a
written extension order and that an oral rendition is sufficient.  See In re
J.L.C., 194 S.W.3d 667, 672 (Tex. App.—Fort Worth 2006, no pet.).  We therefore
hold that the trial court did not violate Mother’s procedural due process
rights by not conducting a hearing before retaining the case on the docket
beyond the one-year dismissal date.  See T.T.F., 331 S.W.3d at 475.  We
overrule this part of Mother’s first issue.

Mother
also argues that the trial court denied her procedural due process rights by
retaining the case on the docket beyond the initial dismissal date because
extraordinary circumstances did not exist to justify retention.  The trial
court noted in the order retaining the case that “extraordinary circumstances”
existed but did not elaborate on what constituted extraordinary circumstances
in this case.

 “Because
an extension of the dismissal date is similar to a continuance and because
section 263.401(b) does not indicate which appellate standard of review to
apply, we apply the abuse of discretion standard.”  In re D.W., 249
S.W.3d 625, 647 (Tex. App.—Fort Worth 2008) (citing In re J.A., No.
02-05-00454-CV, 2006 WL 3114434, at *9 (Tex. App.—Fort Worth 2006, no pet.)
(mem. op.)), pet. denied, 260 S.W.3d 462 (Tex. 2008).

To
determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.  Low
v. Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire v. Cummings, 134
S.W.3d 835, 838–39 (Tex. 2004).  An appellate court cannot conclude that a
trial court abused its discretion merely because the appellate court would have
ruled differently in the same circumstances.  E.I. du Pont de Nemours &
Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); see also Low, 221
S.W.3d at 620.

          Here,
because the case was approaching the initial one-year dismissal date, the
Department requested that the case be retained and that a new dismissal date be
set.  The Department stated in its motion for retention that extraordinary circumstances
necessitated the children remaining in the temporary managing conservatorship
of the Department, that the Department was requesting a jury trial, and that
the trial court had previously ordered a monitored return situation with Mother
and her newest child; Mother did not oppose the Department’s motion.  Mother now
complains of the trial court’s failure to set forth the extraordinary circumstances
that it relied on in retaining the case.  But family code section 263.401 does
not require the trial court to explain in the extension order what the
extraordinary circumstances are that necessitate the extension.  In re
A.T.S., No. 12-07-00196-CV, 2008 WL 2930392, at *18 (Tex. App.—Tyler July
31, 2008, no pet.) (mem. op.).  Because no explanation for the extraordinary
circumstances was required to be included in the extension order, Mother’s due
process rights were not denied by the trial court’s failure to explain the
extraordinary circumstances it found present here.  Second, Mother does not
argue that she was harmed by the trial court’s retention of the case beyond the
one-year dismissal date.  Indeed, the delay permitted Mother to present
evidence to the jury that she had maintained a home during the year preceding
the trial, evidence that she could not have presented to the jury before the March
9, 2009 one-year dismissal date.  See Melton v. Tex. Dep’t of Family &
Protective Servs., No. 03-08-00168-CV, 2010 WL 668917, at *2 (Tex.
App.—Austin Feb. 25, 2010, no pet.) (mem. op.) (holding that the appellant
failed to establish harm from the trial court’s failure to dismiss the suit
within the one-year deadline).  Thus, we hold that the trial court did not deny
Mother due process by retaining the case on its docket beyond the initial
one-year dismissal date.  We overrule this portion of Mother’s first issue.

          F. 
Cumulative Due Process Violation and Abuse of Discretion

          In
the final part of her first issue, Mother contends that each of the above
failures by the trial court and the Department “individually and in sum” denied
her the “procedural guarantees of the Texas Family Code to such an extent that
her due process rights were violated.”  Although we do not condone the trial
court’s and the Department’s lack of diligence in this case, we have held that
each of Mother’s procedural due process arguments is without merit.  Thus, we
also hold that the trial court’s and the Department’s actions or inactions did
not cumulatively violate Mother’s procedural due process rights.  In her second
issue, Mother argues that the trial court abused its discretion in pretrial
matters by denying the motion in which she raised her procedural due process
complaints.  Because we have held that the trial court did not deny Mother due
process, we cannot say that the trial court abused its discretion by denying
her pretrial motion raising due process complaints.  See T.T.F., 331
S.W.3d at 480.  Accordingly, we overrule the remainder of Mother’s first issue
and all of her second issue.

IV.
Legally and Factually
Sufficient Evidence
of Conduct and
Environmental Endangerment
to Support
Termination Order

 

In
her third issue, Mother argues that there is legally and factually insufficient
evidence to establish the termination grounds under family code section
161.001(1)(D) and (E).  Mother focuses her argument on two subissues:  (1) her
alleged failure to maintain stability and a clean and safe home environment for
her children at the time of the removal and prior to the removal and (2) Dr.
Hollis’s failure-to-thrive diagnosis of T.Q.F.

A.      Burden
of Proof and Standards of Review

          A
parent’s rights to “the companionship, care, custody, and management” of her
children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanently—to divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  See
Holick, 685 S.W.2d at 20; Tex. Fam. Code Ann. § 161.206(b) (West
2008).  We strictly scrutinize termination proceedings and strictly construe
involuntary termination statutes in favor of the parent.  Holick, 685
S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort Worth
2009, no pet.).

          In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2010); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987).

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001 (West 2008), § 161.206(a).  Evidence is clear and
convincing if it “will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established.”  Id.
§ 101.007 (West Supp. 2010).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In
re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for
termination and modification).

          In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

          We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not unreasonable. 
Id. at 573.

          In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.  In re
H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that Mother violated section 161.001(1)(D) or (E) and that the termination of
the parent-child relationship would be in the best interest of the child.  Tex.
Fam. Code Ann. § 161.001; C.H., 89 S.W.3d at 28.  If, in light of
the entire record, the disputed evidence that a reasonable factfinder could not
have credited in favor of the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction in the truth of its
finding, then the evidence is factually insufficient.  H.R.M., 209
S.W.3d at 108. 

          B.      Law
on Endangerment

          Endangerment
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no
pet.); see also In re M.C., 917 S.W.2d 268, 269 (Tex. 1996).  To prove
endangerment under subsection (D), the Department had to prove that Mother
knowingly placed or allowed J.G.K. to remain in conditions or surroundings that
endangered her physical or emotional well-being.  See Tex. Fam. Code
Ann. § 161.001(1)(D); In re J.A.J., 225 S.W.3d 621, 625 (Tex.
App.—Houston [14th Dist.] 2006) (op. on reh’g), judgm’t aff’d in part, rev’d
in part by 243 S.W.3d 611 (Tex. 2007).  Subsection (D) focuses on the
suitability of the child’s living conditions.  J.A.J., 225 S.W.3d at 626. 
Thus, under (D), it must be the environment itself that causes the child’s
physical or emotional well-being to be endangered, not the parent’s conduct.  Id
at 627.

          Under
subsection (E), the relevant inquiry is whether evidence exists that the
endangerment of the child’s physical well-being was the direct result of
Mother’s conduct, including acts, omissions, or failures to act.  See J.T.G.,
121 S.W.3d at 125; see also Tex. Fam. Code Ann. § 161.001(1)(E). 
Additionally, termination under (E) must be based on more than a single act or
omission; the statute requires a voluntary, deliberate, and conscious course of
conduct by the parent.  J.T.G., 121 S.W.3d at 125; see Tex. Fam.
Code Ann. § 161.001(1)(E).  It is not necessary, however, that the
parent’s conduct be directed at the child or that the child actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125.  The
specific danger to the child’s well-being may be inferred from parental
misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  A parent’s
mental state may be considered in determining whether a child is endangered if
that mental state allows the parent to engage in conduct that jeopardizes the
physical or emotional well-being of the child.  In re J.I.T.P., 99
S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).  As a general
rule, conduct that subjects a child to a life of uncertainty and instability
endangers the child’s physical and emotional well-being.  See In re S.D.,
980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).  To
determine whether termination is necessary, courts may look to parental conduct
occurring both before and after the child’s birth.  In re D.M., 58
S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). 

C.      Evidence Is
Legally and Factually Sufficient to Support Termination Order

 

          In
determining whether the evidence is legally and factually sufficient to support
termination of Mother’s parental rights pursuant to (D) or (E), we look at
whether Mother (1) knowingly placed or knowingly allowed J.G.K. to remain in
conditions or surroundings that endangered her physical or emotional well-being
or (2) engaged in conduct or knowingly placed J.G.K. with persons who engaged
in conduct that endangered her physical or emotional well-being.  See
Tex. Fam. Code Ann. § 161.001(1)(D), (E).  Although Mother focuses only on two
types of acts or omissions, the Department’s brief contains a combined legal
and factual sufficiency analysis focusing on five types of acts or omissions by
Mother that it contends support termination of Mother’s rights under (D) and
(E):  that Mother’s physical and medical neglect of her children was
endangering; that Mother’s instability and irresponsible choices were
endangering to J.G.K.; that Mother endangered J.G.K. by exposing her to
domestic violence and inappropriate caregivers; that Mother’s anger issues were
endangering to J.G.K.; and that Mother’s drug use was endangering to J.G.K.  We
will examine all of the evidence in the record, focusing on these allegations. 

          Mother
did seek treatment for T.Q.F. when he had RSV and pneumonia, and she had no way
to pay for the medications that he needed upon his discharge from the hospital
because she had allowed his Medicaid to lapse.  Thereafter, when the children
were removed on March 5, 2008, the Department found that they were wearing the
same clothes as the previous day and that the children were dirty and unbathed,
though Mother disputed this.  The record reflects that J.G.K. had two ringworms
at the time of the removal and that Mother had failed to seek treatment for
J.G.K. because Mother had allowed J.G.K.’s Medicaid to lapse.  After the
removal, T.Q.F.’s foster parents took him to a pediatrician, who diagnosed him
as failure to thrive because he had fallen significantly on the growth chart.  Although
Mother tried to show that Dr. Hollis used the wrong growth chart because she
did not use one for a premature infant, Dr. Hollis testified that such charts
are used only for the first year, and T.Q.F. was more than a year old at the
time he was seen by Dr. Hollis.  Dr. Hollis further testified that T.Q.F.’s
failure to thrive not only impacted his growth but also could impact his future
intelligence.  Mother admitted that she had failed to seek treatment for T.Q.F.
even though she recognized that he was not growing and that he was not current
on his vaccinations because she had let his Medicaid lapse.  Moreover, the
places that Mother chose for her family to live exhibited unsafe living
conditions for children—including boards with nails sticking out, rat feces on
the walls, and a hole by the front door—and then Mother made the conditions
worse by leaving out unsafe food and clutter.  Mother admitted that her
children were removed in March 2008 because she could not care for them.  After
the children were removed and she gave birth to G.J.M.-B., Mother purchased a
car and drove G.J.M.-B. in the car even though Mother did not have a license.  This
is some evidence that Mother’s conduct, including omissions, created an
environment that endangered J.G.K.’s physical or emotional well-being.  See
In re S.H.A., 728 S.W.2d 73, 87 (Tex. App.—Dallas 1987, writ ref’d n.r.e.)
(holding that evidence that parents did not properly feed the child and did not
seek appropriate medical treatment for the child was some evidence to support
jury’s findings that parents engaged in conduct which endangered child’s physical
or emotional well-being).

          The
record contains numerous examples of Mother’s instability and irresponsible
choices.  As set forth above, Mother has worked only two days in her life and
has depended on others to provide her and her children with basic necessities,
including food and housing.  As a result, Mother moved frequently as her
relationships with her benefactors ebbed and flowed.  During the time that
Mother was moving back and forth between Dallas Street and Gerald Street, the
two houses were not in the same school district, so J.K.P. was in constant
transition, being moved back and forth between schools.  Durham described the
home environment as “chaotic,” and the record reflects that Mother relied on
the Department to transport J.K.P. to school because Mother often failed to get
J.K.P. to the bus, causing him to miss twenty days of school during the
monitored return.  Although Mother had been renting an apartment for almost a
year at the time of the termination trial, the record revealed that an eviction
proceeding was pending because Mother had been shorting her landlady for
several months.  Mother also disclosed that she had not been responsible in
using the Social Security benefits and tax refunds that she had received; she
had purchased a car that she could not afford and that she could not legally
drive because she had no driver’s license and no car insurance.  Despite the
lack of a driver’s license and car insurance, Mother had driven her car and had
received tickets, for which she was making monthly payments.  Mother had also
failed to use the checks that she had received to get unbarred at the Housing
Authority, and Mother noted at trial that she could have used the checks to
hire an attorney to expunge her criminal record so that she would be in a
better position to apply for jobs and apartments.  Mother spent more than she
received each month and continually relied on help from the Department, CASA,
the mission, and friends and relatives, all the while foregoing WIC.  Moreover,
Mother’s budgets reflected that she did not understand how much more she would
need if each of her children were returned to her.  This is some evidence that
Mother’s conduct, including omissions, endangered J.G.K.’s physical or
emotional well-being and that Mother exposed J.G.K. to an unstable environment
that endangered J.G.K.’s physical or emotional well-being.  See In re T.C.,
No. 10-10-00207-CV, 2010 WL 4983512, at *4–5 (Tex. App.—Waco Dec. 1, 2010, pet.
denied) (mem. op.) (holding that although there were recent developments that
showed improvements in mother’s stability, the trial court could reasonably
have determined that any evidence of improvement was short-lived and outweighed
by the extent of her prior history; thus, the evidence supported that mother,
by living in fifteen locations among other things, had engaged in conduct that
endangered child’s physical and emotional well-being).

          Additionally,
the record demonstrates that the children witnessed domestic violence and were
subjected to inappropriate caregivers.  Mother admitted that her children had
been exposed to and witnessed acts of family violence.  In 2005, Mother
obtained a restraining order against T.M.J.’s father because he had beaten her
(and she also admitted beating him); but prior to the trial, Mother had allowed
him to spend the night in her home with G.J.M.-B. even though he was on
probation for assault family violence.  Mother also allowed her brother to stay
in her home with G.J.M.-B., even though she had told her landlady that he had
hit her in the face and had previously threatened her.  Mother had agreed that
people who assault family members were not appropriate people to have around
children, but Mother had allowed such people around her children, including her
own mother who had hit her in 2007 but whom Mother later relied on to help her
with her children.  In 2005, Mother left four of her children, including
J.G.K., with a woman named Dorothy, whom she had known for only a day.  Dorothy
was mentally ill, and D.J.F. stopped breathing while he was in her care.  The
record does not state why D.J.F. stopped breathing while she was in Dorothy’s
care, but D.J.F. was taken to the hospital, and CPS thereafter removed all four
children.  This is some evidence that Mother’s conduct, as well as the conduct
of those she exposed her children to, endangered J.G.K.  See In re M.R.,
243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence
of exposing a child to domestic violence supports an endangerment finding).

          Moreover,
the record contains numerous instances where Mother could not control her
anger.  Mother had hung up on Johnson; had threatened to “whoop” Durham; had
threatened to shoot when Durham arrived to remove the children; had yelled at
Durham when Durham asked Mother not to yell at the children; had yelled at
Carillo, Safe Harbor workers, and caseworkers; had yelled at J.G.K.’s foster
mother; had been belligerent, rude, and pouty toward Reed; and had hung up on
Reed.  Mother became outraged when she saw a faint scratch on J.G.K.’s face at
one visit and slammed and broke the door at the visitation center.  These
events occurred while Mother was on her bipolar medications, which she claimed
were working.  All of this is some evidence that Mother’s conduct directed
at others, both within the family and outside the family, created an environment
that endangered J.G.K.’s emotional or physical well-being.  See Jordan v.
Dossey, 325 S.W.3d 700, 725 (Tex. App.—Houston [1st Dist.] 2010, pet.
denied) (holding that although there had been recent developments showing
improvements in mother’s condition, such evidence of improvement was
short-lived and outweighed by the extent of her mental history over the course
of the case; thus, mother’s conduct physically and emotionally endangered her
son).

          Furthermore,
the record discloses that Mother used drugs and subjected the children to
others who used drugs.  Mother had fainted from using marijuana in
2002 and had tested positive for cocaine.  Moreover, T.M.J.’s father, whom
Mother allowed in her home, smoked marijuana and had been in a court-ordered
drug rehabilitation program.  This is some evidence that J.G.K.’s emotional
or physical well-being was endangered.  See In re J.T.G., 121 S.W.3d at
125 (holding parents’ and caregiver’s illegal drug use supported a finding that
the child’s surroundings endangered her physical or emotional well-being).

          Viewing
all the evidence in the light most favorable to the termination judgment and
disregarding all contrary evidence that a reasonable factfinder could
disregard, we hold that some evidence exists that will support a factfinder’s
firm conviction or belief that Mother violated subsections (D) and (E).  We
thus hold that the evidence is legally sufficient to support termination of Mother’s
parental rights to J.G.K. under subsections (D) and (E).  See Tex. Fam.
Code Ann. § 161.001(1)(D), (E); R.W., 129 S.W.3d at 739–44 (holding evidence
legally sufficient to support termination under (E) because father had a
history of substance abuse, mental instability, and criminal history); In re
T.H., No. 02-07-00464-CV, 2008 WL 4831374, at *4–5 (Tex. App.—Fort Worth
Nov. 6, 2008, no pet.) (mem. op.) (holding evidence legally sufficient to
support trial court’s 161.001(1)(D) and (E) findings because evidence showed
that father had engaged in conduct that subjected his children to a life of
instability and uncertainty, including living at more than five residences over
five years and living in residences that were “genuinely dirty” and in
disarray; had used illegal drugs; had engaged in domestic violence; and had
exhibited anger issues); Sawyer v. Tex. Dep’t of Protective & Regulatory
Servs., No. 03-02-00286-CV, 2003 WL 549216, at *9 (Tex. App.—Austin Feb.
27, 2003, no pet.) (mem. op.) (holding that evidence was legally sufficient to
support termination under (D) and (E) because mother had a history of mental
illness, housing and financial instability, relationships with violent men, and
drug use). 

Moreover,
viewing all of the evidence in a neutral light, the volume of evidence—set
forth extensively above—that a reasonable factfinder could have credited in
favor of subsections (D) and (E) findings is so significant that a factfinder
could reasonably have formed a firm conviction or belief of the truth of the
allegations that Mother had violated subsections (D) and (E).  See H.R.M.,
209 S.W.3d at 108; C.H., 89 S.W.3d at 28.  We therefore hold that the
evidence is factually sufficient to support termination of Mother’s parental
rights to J.G.K. under subsections (D) and (E).  See Tex. Fam. Code Ann.
§ 161.001(1)(D), (E); R.W., 129 S.W.3d at 739–44 (holding evidence
factually sufficient to support termination under (E) because father had a
history of substance abuse, mental instability, and criminal history); T.H.,
2008 WL 4831374, at *4–5 (holding evidence factually sufficient to support
trial court’s 161.001(1)(D) and (E) findings); In re E.W.A., No.
02-07-00135-CV, 2008 WL 1867144, at *10 (Tex. App.—Fort Worth Apr. 24, 2008, no
pet.) (mem. op.) (holding evidence factually sufficient to support trial
court’s findings under section 161.001(1)(D) and (E) because evidence showed
that mother used illegal drugs, frequently changed residences without the
Department’s permission, and lived with a convicted felon); In re S.A.,
No. 02-06-00253-CV, 2007 WL 1441014, at *10–11 (Tex. App.—Fort Worth May 17,
2007, no pet.) (mem. op.) (holding evidence factually sufficient to support
termination under (D) and (E) because mother suffered from bipolar disorder;
had a history of drug use, including during a pregnancy; had a pattern of
uncontrolled anger; showed instability in her living arrangements; and had a
criminal history); Sawyer, 2003 WL 549216, at *9 (holding
evidence factually sufficient to support termination under (D) and (E)).  We
overrule Mother’s third issue.

V.  Termination Was in J.G.K.’s Best Interest

          In
her fourth issue, Mother argues that the evidence is legally and factually
insufficient to support the trial court’s finding that termination of the
parent-child relationship was in J.G.K.’s best interest.  Specifically, Mother
argues that it was not in J.G.K.’s best interest to terminate Mother’s parental
rights to J.G.K. because Mother was caring for G.J.M.-B. at the time of trial
and because the evidence showed that Mother loved J.G.K.

          There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1) the child’s age
and physical and mental vulnerabilities;

 

(2) the frequency and
nature of out-of-home placements;

 

(3) the magnitude,
frequency, and circumstances of the harm to the child;

 

(4) whether the child
has been the victim of repeated harm after the initial report and intervention
by the department or other agency;

 

(5) whether the child
is fearful of living in or returning to the child’s home;

 

(6) the results of
psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child’s
home;

 

(7) whether there is
a history of abusive or assaultive conduct by the child’s family or others who
have access to the child’s home;

 

(8) whether there is
a history of substance abuse by the child’s family or others who have access to
the child’s home;

 

(9) whether the
perpetrator of the harm to the child is identified;

 

(10) the willingness
and ability of the child’s family to seek out, accept, and complete counseling
services and to cooperate with and facilitate an appropriate agency’s close
supervision;

 

(11) the willingness
and ability of the child’s family to effect positive environmental and personal
changes within a reasonable period of time;

 

(12) whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with:

 

(A) minimally
adequate health and nutritional care;

 

(B) care, nurturance,
and appropriate discipline consistent with the child’s physical and
psychological development;

 

(C) guidance and
supervision consistent with the child’s safety;

 

(D) a safe physical
home environment;

 

(E) protection from
repeated exposure to violence even though the violence may not be directed at
the child;  and

 

(F) an understanding
of the child’s needs and capabilities;  and

 

(13) whether an
adequate social support system consisting of an extended family and friends is
available to the child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

          Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include (A) the desires of the
child, (B) the emotional and physical needs of the child now and in the future,
(C) the emotional and physical danger to the child now and in the future, (D)
the parental abilities of the individuals seeking custody, (E) the programs
available to assist these individuals to promote the best interest of the
child, (F) the plans for the child by these individuals or by the agency
seeking custody, (G) the stability of the home or proposed placement, (H) the
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one, and (I) any excuse for the acts
or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371–72
(Tex. 1976).

          These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

          In
analyzing the section 263.307(b) factors, the record reveals that J.G.K. was seven
at the time of trial and had no physical issues.  Mother admitted that J.G.K.
had been in foster care most of her life.  The frequency and circumstances
surrounding the harm caused to J.G.K. are detailed thoroughly above, including
additional harm imposed on her by required visits with Mother during which
Mother often yelled at those at the CPS visitation center.  J.G.K. made it
clear that she did not want to live with Mother because she was scared of
Mother, who was loud and yelled a lot.  Mother also moved frequently.  Mother’s
psychological evaluation revealed that she suffered from depression and bipolar
disorder and that she took medication, but the record also revealed that the
medication did not subdue all of Mother’s anger issues, as evidenced by
Mother’s yelling at various people involved in the case and her slamming and
breaking the door at the CPS visitation center.  Mother admitted that the
children had witnessed domestic violence in the home.  The record demonstrated
that Mother had overdosed on drugs and had allowed others, who were known to
use drugs, into her home.  Mother completed some of her services but relied
heavily upon CPS, CASA, the mission, and friends and family to provide for her
family’s needs because Mother was irresponsible with her money.  Additionally,
Mother did not take advantage of WIC, job opportunities, and education opportunities
that were offered to her, and she often “no-showed” for the appointments that
were made for her.  Although Mother testified that she wanted her children
back, her actions demonstrated otherwise.  Mother failed to demonstrate
adequate parenting skills as shown by T.Q.F.’s failure-to-thrive diagnosis,
J.G.K.’s untreated ringworms, and pictures of unsafe living conditions.  Mother
also chose an unsafe caregiver named Dorothy to look after her children and had
allowed her mother to take care of her children even though her mother had
assaulted Mother.

          With
regard to the Holley factors, the record reveals that although J.G.K.
did not testify at trial, her wishes were relayed by others; J.G.K. did not
want to visit with her Mother, nor did she want to live with her.  J.G.K. had
the same physical and emotional needs as any other child, which would include a
stable living environment.  The present and future emotional and physical
danger to J.G.K. stemmed from the fact that J.G.K. had spent most of her life
in foster care, not with Mother, so moving in with Mother would be emotionally
detrimental to J.G.K., would wipe out the progress she had made, and would
cause her to “revert substantially,” according to Reed.  Although Mother had
completed parenting classes, she had not proven her ability to support her
children without major intervention by numerous organizations and individuals. 
Mother had used so much help from CASA that Reed was no longer allowed to
provide concrete services to Mother, yet Mother did not take full advantage of
all the government programs that were offered to assist her.  Mother wanted
J.G.K. to live with her, but Mother had not decided where she would live, had
not checked into where J.G.K. would attend school, and had not confirmed
whether the mission would provide all the clothes and necessities that she
expected to obtain from them.  The Department’s plan was to allow the
foster mother to adopt J.G.K. if Mother’s parental rights were terminated, and
the record revealed that the foster mother could provide for J.G.K., even
though Mother did not think it was a loving, stable, safe environment.  Johnson
did not dispute Mother’s testimony that G.J.M.-B. was doing well, but the fact
that Mother was doing well with G.J.M.-B. did not change the Department’s
opinion of Mother’s parenting abilities regarding J.G.K.  Reed also did not
dispute that Mother loved her children, but Reed had sat through all the
previous trials and had not heard anything that made her believe that Mother
had truly changed.  During the two years that Johnson worked the case, she
never heard Mother accept responsibility.

          Considering
the relevant statutory factors in evaluating Mother’s willingness and ability
to provide J.G.K. with a safe environment and the Holley factors, we
hold that the evidence is both legally and factually sufficient to support the
trial court’s finding that termination of Mother’s parental rights to J.G.K. is
in her best interest.  See Tex. Fam. Code Ann. § 161.001(2); Jordan,
325 S.W.3d at 733 (holding evidence legally and factually sufficient to support
the trial court’s finding that termination of mother’s parental rights was in
child’s best interest when most of the best interest factors weighed in favor
of termination); T.H., 2008 WL 4831374, at *6–7 (holding evidence
legally and factually sufficient to support best interest finding based on
evidence of parent’s substance abuse, domestic violence, anger management
issues, multiple residences, and inability to provide a safe and healthy environment
for children); E.W.A., 2008 WL 1867144, at *12–13 (holding evidence
factually sufficient to support best interest finding based on analysis of Holley
factors and evidence that there was a history of domestic violence, drug use,
and domestic instability); Sawyer, 2003 WL 549216, at *10–11 (holding evidence
legally and factually sufficient to support best interest finding because
mother’s history of homelessness, unemployment, drug use, and relationships
with violent men did not provide assurance of stability and permanence).  We
therefore overrule Mother’s fourth issue.

VI.  Conclusion

          Having
overruled each of Mother’s four issues, including her subissues, we affirm the
trial court’s judgment terminating Mother’s parental rights to J.G.K.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
GARDNER, WALKER, and MCCOY, JJ.

 

DELIVERED:  June 23, 2011  









[1]See Tex. R. App. P. 47.4.





[2]We note that Mother
struggled to give the correct birth dates for each of her children.  The
factual background section, as well as our analysis, covers all six of Mother’s
children because the pediatrician who testified at trial stated that Mother’s
treatment of one child was relevant to her other children.





[3]We refer to the Texas
Department of Family and Protective Services interchangeably as “the
Department” and “CPS.”





[4]Mother told her caseworker
that she could not work because of criminal charges in 2007.





[5]The police records
admitted at trial were voluminous and included police reports of incidents in
which Mother was a suspect and others in which she was a victim.  Not all of
the police reports were legible, but those that were revealed that Mother was
charged with assault, among other things, on multiple occasions, but the
charges were not prosecuted.  At the time of trial, Mother was supposed to be
performing community service for a disorderly conduct charge.





[6]Mother was evicted because
D.J.F.’s father had been caught visiting at Mother’s residence even though he
was barred from the Housing Authority.





[7]D.J.F.’s father also
fathered T.Q.F.





[8]Mother’s psychological
evaluation dated June 19, 2006 reveals that “[t]here have been prior referrals
to CPS for medical neglect and for leaving [the children] alone.”





[9]Durham testified that she never
told Mother that J.G.K.’s case had been dismissed but that Durham was not going
to move J.G.K. because it would be unfair to D.J.F.  Durham testified that she actually
moved J.G.K. and D.J.F. at the same time and that it had nothing to do with the
dismissal of J.G.K.’s case.





[10]The record, however,
reveals that Mother did not begin receiving Social Security disability until
May 2009.





[11]Mother said that she had
to respect her cousin’s wishes to not tell the Department where she was
staying.  Mother was cross-examined about her statement that she would do
anything for her children but yet she had listened to her cousin instead of
following the trial court’s rules, which included telling CPS where she was
living.  She said that is when Durham told her to go back to 506 Dallas Street,
and Mother complied.





[12]Mother said that she did
not know that Ta’Niel was moving until the last minute and that Ta’Niel moved
because Durham told her that she needed a bigger house.  Durham testified that
she did not tell Ta’Niel that she needed a bigger house.





[13]Mother said that she did
not contribute to the household; she did not buy groceries or pay the bills.





[14][14]At one point, Mother listed
the following as places she had lived: the Housing Authority, Park Regency,
Marconi, Sun Valley Apartments, Dallas Street, First Step, Gerald Street,
Britain Street, Cleveland Street, Juarez House, Faith City Mission, and 1919
8th Street.  Mother thought that she had told CPS twice in advance before a
move.  Mother admitted that she did not always notify Durham before she moved
but that she should have.  Mother, however, stated that throughout the
monitored return, Durham always knew where Mother was living.  When asked how
that was consistent with a willingness to do anything that it took to get her
children back, Mother said, 

I’ve shown numerous of times.  I done did everything
y’all wanted me to do, done came to every court hearing.  Even the ones that I
wasn’t supposed to come to, I’m here for my kids.  So what more do y’all want
from me?  What, what -- I mean what else can I do?  If I got a job making $25
an hour and got a six-bedroom house, that still wouldn’t be good enough for
y’all.  Because y’all want my kids.  Y’all want to adopt my kids out.  So anything
I do, it’ll never be good enough for y’all, period point blank.  [CASA worker] Mauri
done made that clear. Linda done made that clear. [CPS worker] Kristi Row done
made that clear.  Y’all done made that perfectly clear.  And I will continue to
appeal and appeal and appeal until I get my kids back.  I’m going to fight
y’all to the end.  I’m not going to give up just like that.  So y’all can sit
up there and y’all can – [the trial court interrupted Mother and instructed her
not to give a narrative.].





[15]Dr. Hollis said that it
constitutes medical neglect when a parent has a child with two ringworms and
does not take the child to get medical treatment.





[16]When Mother later received
a $1,000 check from Social Security, she used $900 of it to buy clothes and Christmas
gifts for her children.  Mother thereafter started receiving $675 per month.





[17]Presumably, Mother was
barred from the Housing Authority due to the prior eviction for allowing a
“barred” person, D.J.F.’s father, to visit her while she lived at the Housing
Authority.





[18]Mother had until the end
of August 2009 to complete her requirements to get into the Housing Authority,
or she would be moved to the bottom of the list and have to restart the
application process.  At one point prior to admitting that she had done nothing
to get back on the Housing Authority list, Mother testified that she had asked
CASA and/or CPS for the money to pay off her outstanding balance at the Housing
Authority and was denied, so her landlady allowed her to “short her.”  But Mother
continued living at 1919 8th Street and was not considering moving to the
Housing Authority at the time of the termination trial.





[19]Mother’s landlady
testified that Mother had a sign on her door that said, “Do not come knocking on
my door for drugs.”





[20]Mother admitted that she
smoked three or four cigarettes a day but said that she did not pay for them;
if she asked someone for a cigarette and he/she did not give her one, she did
not need one.





[21]Mother said that T.M.J.’s
father was bipolar and was “kind of slow.”  She said that he received a monthly
Social Security disability benefits check.





[22]T.M.J.’s father was arrested
May 10, 2010.  Mother testified that he was in jail for violating his probation
on an assault family violence charge.  Mother admitted that T.M.J.’s father
stayed the night occasionally and would sometimes stay for a week, but she
later testified that he did not stay with her.

At some point, T.M.J.’s father was in a court-ordered
lockdown drug rehab facility a/k/a Substance Abuse Felony Punishment facility.  T.M.J.’s
father was released in February 2010 and was supposed to report to a halfway
house but failed to do so.  Mother said that he was taken to jail the week of
the trial because he had not done community service hours and had not paid his
probation fees.

Mother said that while T.M.J.’s father was in jail,
she was making her car payments herself.





[23]Mother was ordered to
perform community service on her disorderly conduct charge, but she had not
completed her community service.  Mother said that she was aware that her
disorderly conduct case had gone into “active warrant stage” and that was when
she made an appointment and received a payment plan.  She testified that she no
longer had a warrant.





[24]Mother did not realize
that her lease required her to request in writing that repairs be made; she
admitted that she had not complied with that provision.  Mother also did not
know that her lease required her to make all repairs that cost less than $50.





[25]Copies of judgments that
related to Prentice’s convictions for evading arrest and theft were admitted
into evidence at trial.





[26]During the psychological
evaluation, Mother admitted that she had previously been in the state hospital
for one day after she had tried to cut her wrist following a family conflict. 
The notes from her psychiatric evaluation state that Mother took an overdose of
some pills “in a suicide gesture” during her early teenage years but did not go
to the hospital because she felt fine after she vomited.





[27]The records from Helen
Farabee reveal that Mother “no-showed” for approximately ten appointments from
2008 to 2009 and that she still felt depressed on a daily basis as of March 17,
2010, and would sleep all day, getting up only to feed G.J.M.-B.





[28]Mother testified that she
understood the Department’s no-show, no-call policy, which allowed the
Department to stop paying for Mother’s services and to require Mother to pay
for them if she missed a certain number of meetings.  At trial, the Department
admitted records from Family Circle Services, which show that Mother often
no-showed for her parenting classes during the 2007 to 2008 period.





[29]The notes from Mother’s
2009 psychological evaluation state that Mother “has episodes of exploding in
anger and has done so when her children are in the room.”





[30]The termination of
Mother’s parental rights to T.Q.F. was affirmed in In re T.T.F., 331
S.W.3d 461, 489 (Tex. App.—Fort Worth 2010, no pet.).  It is unknown why the
initials are different, but the appeal dealt with T.Q.F.





[31]Mother testified that her
children had been removed, placed back, and then removed again, but Mother did
not think that she had already received a second chance.  She did not know how
many chances she should receive at the detriment of her children.





[32]As set forth above, one
apartment that Mother was looking at rented for $325 per month and did not
include utilities and another apartment rented for $410 and included utilities,
as compared to the $500 per month that Mother was paying for her apartment at
the time of the termination trial.





[33]Mother never said that it
was her fault that her Medicaid and her food stamps lapsed.





[34]Durham said that Mother
moved back and forth from Dallas Street to the other Gerald Street because the
Gerald Street house was G.J.M.-B.’s father’s house; Mother left after they
fought and returned when they made up.  Durham said that G.J.M.-B.’s father’s
criminal history check came back clean.





[35]Durham testified that the
home at 924 Gerald Street was acceptable and that the Dallas Street home was
habitable in the beginning but then deteriorated.  The home on Britain Street
was “very clean” and “really good,” so they asked Mother not to go back to Dallas
Street.





[36]Durham said that it was
not true that Mother never asked for bus passes or rides; the Department provided
a lot of transportation for Mother.





[37]Durham saw T.M.J. but did
not learn until later that he had ringworms that were not being treated because
of the lack of Medicaid.





[38]Durham did not take
pictures at the Cleveland Street residence to try to make Mother look bad; there
simply were not any “not bad places.”





[39]The removal at the
Cleveland Street address was due to the condition of the house, combined with
other facts—that Mother had failed to keep up her Medicaid and was not getting
T.Q.F. his medicine, that Mother had failed to keep up her food stamps, that Mother
had also made no effort to become independent and had demonstrated that she
could not provide for the basic needs of her family, that Mother had moved
countless times without telling Durham her whereabouts, that Mother had planned
to move to Texarkana with her boyfriend, and that there was no refrigerator and
nothing in the cabinets.





[40]When T.Q.F. was two
months old in March 2007, he was seen at a clinic and was in the twenty-fifth
percentile on the growth chart.  At his seven-month visit, T.Q.F. was a little
above the tenth percentile.  Dr. Hollis did not see T.Q.F. while Mother had him
during the monitored return.





[41]T.Q.F.’s foster parents cared
for him from birth until seven months, and T.Q.F. returned to their home after
his hospitalization when he was approximately thirteen months old.





[42]Dr. Hollis was questioned
extensively regarding the growth chart that she used for T.Q.F.  She testified
that she had reviewed the perinatal records, showing that T.Q.F. weighed five
pounds, six ounces at birth and was born premature at thirty-six weeks, six
days.  Dr. Hollis testified that there is an adjusted growth chart for
premature babies but that she did not use that chart because it goes up to only
twelve months and because T.Q.F. was basically a full-term baby, as
thirty-seven weeks is considered full term.  Dr. Hollis testified that charting
a premature baby on a regular growth chart would make it fall lower because the
pre-term growth charts are adjusted to reflect the weight differences in
premature infants.  But Dr. Hollis later explained that the premature chart and
the normal chart should coalesce at twelve months because a premature infant
should be “totally caught up with [his] term peers.”





[43]Dr. Hollis treated T.Q.F.
multiple times for ear infections after he moved back to foster care, but she
testified that the ear infections did not cause him to drop two lines on the
growth chart.  Dr. Hollis referred T.Q.F. to an ear nose and throat specialist
for tubes, and he underwent surgery to put tubes in his ears.





[44]Johnson did not know when
the Department decided to pursue termination instead of reunification.





[45]Johnson testified that the
Department does not remove children simply because parents get behind on their
bills or because parents are poor, but the Department does remove children if
their parents’ inability to provide for the children endangers them.





[46]Johnson never received a
signed service plan from Mother.





[47]Johnson testified that as
of September 2009, Mother had not gotten G.J.M.-B.’s Social Security card,
which was needed in order to get into the Housing Authority.





[48]T.Q.F. was in an adopting
placement with the foster parents who were caring for J.K.P., and the two boys
have a relationship with J.G.K.





[49]Johnson said that “a
chance” is an opportunity to make a change and that Mother had not made appropriate
lasting change.





[50]T.Q.F.’s diagnosis of
failure to thrive was an endangering condition.





[51]Barber had also worked a
previous case with Mother back in March 2005, which focused on J.K.P.





[52]The State notes in its
supplemental brief that the initial order naming the Department as the
temporary managing conservator of J.G.K. was signed on March 6, 2008, and that
the sixtieth day following that order would therefore have been May 5, 2008. 
There was a status hearing on October 2, 2008, involving some of the children
in Mother’s care.  See T.T.F., 331 S.W.3d at 478.  But the State
concedes that there is no order relating to a status hearing in the record in
the instant case and that such status hearing was untimely.





[53]Mother first complained
about the lack of a timely status hearing in her motion to dismiss, almost
sixteen months after the statutory hearing date deadline had passed and after
the trial court had held two permanency hearings in this case.  Thus, her
complaint was not timely.